Henryk **DE KWIATKOWSKI**,
Plaintiff–Appellee,

v.

**BEAR, STEARNS & CO., INC.,** Bear, Stearns Securities Corporation, and Bear Stearns Forex Inc., **Defendants–Appellants,**

and

**Albert J. Sabini, Defendant.**

Docket No. 01–7112.

United States Court of Appeals,
Second Circuit.

Argued Jan. 7, 2002.

Decided Sept. 19, 2002.

Louis R. Cohen, Washington, DC (Charles E. Davidow, Paul A. Engelmayer, Wilmer, Cutler & Pickering, Washington, DC; Dennis J. Block, Jonathan D. Polkes, Cadwalader, Wickersham & Taft, New York, NY; John L. Warden, Kenneth M. Raisler, Sullivan & Cromwell, New York, NY; Bernard J. Rothbaum, Jr., Hartzog Conger Cason & Neville, Oklahoma City, OK, on the brief), for Appellants.

Myron Kirschbaum, New York, NY (Paul J. Curran, Daniel L. Reisner, Andrew K. Solow, Kaye Scholer LLP, New York, NY, on the brief), for Appellee.

Matthew D. Slater, Washington, DC (Giovanni P. Prezioso, Onnig H. Dombalagian, Petia Vretenarova, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, on the brief), for The Bond Market Association, the Futures Industry Association, and the Foreign Exchange Committee, as amici curiae appearing on behalf of Appellant.

Richard A. Rosen, New York, NY (Lara Shalov, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, on the brief), for the Securities Industry Association, as amicus curiae appearing on behalf of Appellant.

Daniel J. Roth, Executive Vice President and General Counsel, National Futures Association, Chicago, IL, for National Futures Association, as amicus curiae appearing on behalf of Appellant.

David C. Vladeck, Washington, DC (Alan B. Morrison, Public Citizen Litigation Group, Washington, DC, on the brief), for Public Citizen, as amicus curiae appearing on behalf of Appellee.

Before: JACOBS, F.I. PARKER, SOTOMAYOR, Circuit Judges.

JACOBS, Circuit Judge.

In a period of less than five months in 1994–95, plaintiff Henryk de Kwiatkowski ("Kwiatkowski") made and lost hundreds

of millions of dollars betting on the U.S. dollar by trading in currency futures. Kwiatkowski traded on a governmental scale: At one point, his positions accounted for 30 percent of the total open interest in certain currencies on the Chicago Mercantile Exchange. After netting over $200 million in the first trading weeks, Kwiatkowski's fortunes turned; between late December 1994 and mid-January 1995, Kwiatkowski suffered single-day losses of $112 million, $98 million, and $70 million. He continued losing money through the winter. Having lost tens of millions over the preceding several days, Kwiatkowski liquidated all his positions starting on Sunday, March 5 and finishing the next day. In all, Kwiatkowski had suffered net losses of $215 million.

In June 1996, Kwiatkowski sued the brokerage firm (and related entities) that had executed his trade orders, Bear, Stearns & Co., Inc., Bear, Stearns Securities Corporation, and Bear Stearns Forex Inc. (collectively, "Bear Stearns" or "Bear"), as well as his individual broker, Albert Sabini ("Sabini"), alleging (*inter alia*) common law negligence and breach of fiduciary duty. At trial, Kwiatkowski contended that Bear and Sabini failed adequately to warn him of risks, failed to keep him apprised of certain market forecasts, and gave him negligent advice concerning the timing of his trades.

In May 2000, a jury in the United States District Court for the Southern District of New York (Marrero, *J.*) found Bear negligent and awarded Kwiatkowski $111.5 million in damages. The jury found for Bear on the breach of fiduciary duty claim. Sabini prevailed on both claims.

Bear made timely motions for judgment under Fed.R.Civ.P. 50, arguing principally that Kwiatkowski's account was a "nondiscretionary" trading account (i.e., one where all trades require the client's authorization), and that as to such accounts (as a matter of law) a broker has none of the advisory duties that Bear was found to have breached.

In an opinion dated December 29, 2000, the district court denied Bear's motion for judgment. *Kwiatkowski v. Bear Stearns & Co., Inc.*, 126 F.Supp.2d 672 (S.D.N.Y. 2000). The court ruled that the unique facts and circumstances of the parties' relationship permitted the jury reasonably to find that Bear undertook to provide Kwiatkowski with services beyond those that are usual for nondiscretionary accounts, and that there was evidence sufficient to find that Bear provided those services negligently. The district court added $53 million to the jury's damages award for pre-judgment interest dating back to March 6, 1995, bringing Kwiatkowski's total recovery to $164.5 million.

On appeal, Bear argues principally: [1] that as a matter of law, because Kwiatkowski was a nondiscretionary customer, Bear had no ongoing duty to provide him with information and advice; [2] that Bear did not undertake to provide ongoing advice and account-monitoring services; and [3] that Bear was not negligent in performing any of the services it did provide.

We reverse.

## Background

The facts of this case are recounted in scrupulous detail in the district court's opinion denying Bear's Rule 50(b) motion. *Kwiatkowski*, 126 F.Supp.2d at 678–83. On appeal, we review the evidence (as the district court did) in the light most favorable to Kwiatkowski, resolving ambiguities in his favor. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) ("Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party,

is insufficient to permit a reasonable juror to find in her favor.").

## A. *Facts*

For the most part, the operative facts are undisputed. Kwiatkowski first opened an account at Bear Stearns in 1988, when his broker, Albert Sabini, relocated there from the defunct E.F. Hutton firm. The account was handled by Bear's "Private Client Services Group," which provides large private investors with enhanced services, including access if requested to the firm's executives and financial experts. As a member of this group, Sabini was in regular contact with Kwiatkowski, often communicating several times a day. Sabini provided his client with news and market reports, and sometimes sent him Bear Stearns documents containing market forecasts and investment recommendations.

At first, Kwiatkowski's account at Bear was limited to securities trading. His currency trading was conducted through Bank Leu, a bank in the Bahamas, where Kwiatkowski maintained his principal residence. In January 1991, Kwiatkowski opened a futures account at Bear by transferring from Bank Leu a position consisting of 4000 Swiss franc short contracts traded on the Chicago Mercantile Exchange ("CME"). Kwiatkowski effected the transfer because he thought Bear would be better able to service the account, Sabini having "extolled the capacity of Bear Stearns to provide him the full services and resources he needed for large-scale foreign currency trading." *Kwiatkowski*, 126 F.Supp.2d at 679. The Private Client Services Group provided its

clients with access to Bear's financial experts and executives, *id.* at 678, and advertised "a level of service and investment timing comparable to that which [Bear] offer[ed its] largest institutional clients." *Id.* at 702.

Kwiatkowski's futures account at Bear was at all times "nondiscretionary," meaning that Bear executed only those trades that Kwiatkowski directed.[1] When the account was opened in January 1991, Kwiatkowski signed a number of documents and risk-disclosure statements (some of which were mandated by federal regulations). These reflect in relevant part that:

- Kwiatkowski declared his net worth to be in excess of $100 million, with liquid assets of $80 million;
- He was warned that "commodity futures trading is highly risky" and a "highly speculative activity," that futures "are purchased on small margins and ... are subject to sharp price movements," and that he should "carefully consider whether such [futures] trading is suitable for [him]";
- He was warned that because, under some market conditions, he "may find it difficult or impossible to liquidate a position"—meaning that he "may sustain a total loss" of his posted collateral—he should "constantly review [his] exposure ... and attempt to place at risk only an amount which [he knew he could] afford to lose";
- He was warned that if he chose to trade on margin, he could lose more than what he posted as collateral;

---

1. One of Kwiatkowski's main contentions is that Bear assumed a far more extensive advisory role than the "nondiscretionary" label would imply. But there is no dispute that the account was (at least nominally) nondiscretionary, and that all trades were in fact done per Kwiatkowski's instructions. (Kwiatkowski apparently contended at an earlier stage of the case that Bear had traded in his account without authorization, but that allegation was withdrawn and is not before us on appeal.)

- He gave Bear a security interest in all his accounts at the firm, authorized Bear to transfer funds from his other account to his futures account if necessary to avoid margin calls, and authorized Bear to protect itself by liquidating his futures account if Kwiatkowski failed to meet margin requirements.

126 F.Supp.2d at 679.

Kwiatkowski's trading strategy reflected his belief in the long-term strength of the U.S. dollar. As he testified at trial, he had believed "the dollar should appreciate" over time, though he conceded that he always understood that the dollar would experience "ups and downs" in the near term. Tr. 472–74.

Kwiatkowski had been an experienced currency trader before he opened his Bear Stearns futures account. As an entrepreneur and founder of Kwiatkowski Aircraft—which leases and sells airplanes internationally—he developed a background in trading to hedge the risks associated with his company's foreign currency transactions. Kwiatkowski also had experience betting on the dollar in hopes of earning speculative profit. In 1990, shortly before transferring his Bank Leu position to Bear Stearns, Kwiatkowski lost nearly $70 million in that account when the dollar declined against the German mark and Swiss franc.

Before Kwiatkowski did his first currency transaction at Bear in September 1992, he met with Bear's then-Chief Economist, Lawrence Kudlow, who expressed the view that the dollar was undervalued worldwide and therefore was a good investment opportunity. In the weeks following this meeting, Kwiatkowski executed several trades betting on the rise of the dollar, ultimately acquiring 16,000 open contracts on the CME. He closed his position in January 1993, having made $219 million in profits in about four months. At trial, Kwiatkowski testified that he consulted Bear prior to liquidating: "We discussed it and they thought the advisement was a change of feelings about it." Tr. at 483. The record is vague as to who at Bear said what, but (construing ambiguities in Kwiatkowski's favor) a fair reading is that Kwiatkowski was encouraged by someone at Bear to liquidate his position.

Kwiatkowski's futures account was dormant between January 1993 and October 1994. Kwiatkowski testified that in an October 1994 phone call, Sabini told him that "this is the time to buy the dollar," and that "this time the dollar will do what [Kwiatkowski] always believed it would do." Tr. 490. Kwiatkowski began aggressively short-selling the Swiss franc, the British pound, the Japanese yen, and the German mark. Within a month, Kwiatkowski amassed 65,000 contracts on the franc, pound, yen, and mark in equal proportions—a position with a notional value of $6.5 billion.[2] All of the transactions were executed on the CME. At one point, Kwiatkowski's position amounted to 30 percent of the CME's total open interest in some of the currencies. According to David Schoenthal, the head of Bear Stearns Forex, Kwiatkowski's position was more than six times larger than any other position Schoenthal had ever seen in 27 years on the CME.[3] Tr. 1111–12.

In mid-November 1994, after Kwiatkowski had acquired the bulk of his position

---

**2.** Notional value refers to the dollar value of the quantity of foreign currency covered by a contract. One contract is typically worth about $100,000.

**3.** The record does not indicate that Bear specifically advised Kwiatkowski to build a position of that size; it does reflect that Kwiatkowski understood Bear (via Sabini) to be "bullish" on the dollar, and chose to invest at least in part for that reason.

(approximately 58,000 contracts), Sabini sent him a copy of a report by Wayne Angell, then-Chief Economist at Bear, entitled "Dollar Investment Opportunity," expressing the view that the dollar was still undervalued. According to Kwiatkowski, the report influenced him to "roll over" his entire 65,000–contract position past the December date on which the contracts came due.

Like many speculative investors, Kwiatkowski traded on margin, meaning he put up only a fraction of the $6.5 billion notional value, as specified by the brokerage firm. As the dollar fluctuated, Kwiatkowski's position was "marked-to-market," meaning that his profits were added to his margin and his losses were deducted. As he earned profits, his margin increased, meaning he could opt (as he did) to have profits paid out to him daily; when losses reduced his margin, Kwiatkowski was compelled to meet the margin requirement by depositing more money or by liquidating contracts. Thus, while Kwiatkowski put up only a small percentage of the notional value (well under ten percent, which is apparently not unusual), his personal profits and losses reflected the full $6.5 billion position, and magnified vastly the slightest blip in the dollar's value.

As Kwiatkowski acquired his colossal position in the volatile futures market, Bear took precautions. In November 1994, the firm's Executive Committee and senior managers assumed oversight of Kwiatkowski's account. Bear also required Kwiatkowski to increase his posted margin collateral to $300 million in cash and liquid securities.

In late November or early December, Schoenthal told Bear's Executive Committee that Kwiatkowski's position was too conspicuous on the CME to allow a quick liquidation, and (with Sabini) recommended to Kwiatkowski that he move his position to the over-the-counter ("OTC") market, the unregulated international commodities market whose traders generally consist of governments and large financial institutions. Schoenthal told Kwiatkowski that he could trade with less visibility on the larger and more liquid OTC market, and more easily liquidate without impacting the market. According to Kwiatkowski, Schoenthal told him that, when and if Kwiatkowski needed to liquidate, Schoenthal could get him out of the OTC market "on a dime." Tr. 502. Kwiatkowski accepted Schoenthal's recommendation in part: when it came time to roll over his contracts in early December, Kwiatkowski moved half of them to the OTC market.

By late January 1995, Kwiatkowski's account had booked breathtaking gains and losses. As of December 21, 1994—less than two months after he resumed currency speculation at Bear—Kwiatkowski had made profits of $228 million. When the dollar fell a week later, Kwiatkowski lost $112 million in a single day (December 28). When the dollar fell again, on January 9, 1995, Kwiatkowski lost another $98 million. Ten days later, on January 19, he lost $70 million more. After absorbing these hits, Kwiatkowski was still ahead $34 million on his trades since October 28, 1994.

As the dollar fell, Kwiatkowski consulted with Bear at least three times. After the December 28 shock, Kwiatkowski told Schoenthal and Sabini he was concerned about the dollar and was thinking of closing his position. They advised him that it would be unwise to liquidate during the holiday season, when the markets experience decreased liquidity and prices often fall.[4] The dollar rebounded on December

---

4. According to Kwiatkowski, Schoenthal and Sabini advised him at the time that "between Christmas and New Years it is too short a period to liquidate, it is unwise to liquidate the position now." Tr. 509.

29, and Kwiatkowski recouped $50 million of the previous day's losses.

After the January 9 decline, Kwiatkowski spoke with Sabini and Wayne Angell, Bear's Chief Economist. According to Kwiatkowski, Angell thought that the dollar remained undervalued and would bounce back. Kwiatkowski decided to stand firm. In late January, he spoke with Schoenthal about the U.S. Government policy of strengthening the Japanese yen, and afterward Kwiatkowski liquidated half of his yen contracts.

The dollar remained volatile through the winter, due in large part (it was thought) to geopolitical currents. Two salesmen in Bear's futures department, William Byers and Charles Taylor, who wrote a monthly report called Global Futures Market Strategies, announced in their February 1995 issue that they were downgrading the dollar's outlook to "negative," principally because of the Mexican economic crisis, certain steps taken by the Federal Reserve Board, and an anticipated increase in German interest rates. The report cited the German mark and the Swiss franc as especially likely to strengthen—two of the currencies in which Kwiatkowski held short positions. Kwiatkowski testified that he never received a copy of this report.[5]

As of February 17, Kwiatkowski was down $37 million since October 1994. In mid-February, rather than deposit more cash, Kwiatkowski instructed Bear to meet future margin calls by liquidating his contracts. As the dollar declined, Bear gradually liquidated Kwiatkowski's position (obtaining his approval of each trade). By the close of business on Thursday, March 2, 1995, Kwiatkowski's total position had been reduced to 40,800 contracts in the Swiss franc and the German mark. He had suffered net losses of $138 million in slightly over four months.

Over the next three days, the dollar fell sharply against both the franc and the mark, and Kwiatkowski's remaining contracts were liquidated at a further loss of $116 million.

On the morning of Friday, March 3, Bear tried to reach Kwiatkowski for authorization to liquidate 18,000 of his contracts in order to meet a margin call. Kwiatkowski was unavailable, so (as the account agreement allowed) Bear effected the liquidation unilaterally and secured Kwiatkowski's approval later that day. At that time, Kwiatkowski expressed interest in liquidating his position altogether. Schoenthal and Sabini advised Kwiatkowski that because market liquidity generally lessens on Friday afternoons, it would be prudent to hold on and take the chance that the dollar would strengthen.[6] According to Kwiatkowski, he relied on this ad-

---

5. Evidently the same publication repeated its dollar-negative forecast in March 1995, but it may not have been published before Kwiatkowski exited the market in early March, and in any event he only testified to not receiving the February report.

6. According to the district court's opinion, Schoenthal and Sabini suggested that Kwiatkowski "postpone" further liquidation until Sunday, March 5, when the markets opened first in Australia and New Zealand, and later in Asia. 126 F.Supp.2d at 682. As far as we can see, the record reflects no recommendation on Friday to liquidate on Sunday. Kwiatkowski testified that he was advised that Friday was a bad time and that the market might improve, without being warned that the situation could worsen over the weekend. Tr. 516–17. Sabini testified that the advice was to wait to see if the dollar "might rally." Tr. 213. Kwiatkowski does not assert on appeal that anyone told him that Sunday was a better day than Friday to liquidate; his argument is that Schoenthal advised that Friday afternoon was a bad time, and that Bear knew that "if Kwiatkowski's positions had to be liquidated after the close of trading on Friday," this would be done on Sunday when only the Asian markets were open.

vice in deciding to hold on to the balance of his contracts.

When the overseas markets opened on Sunday (New York time), the dollar fell. Schoenthal was in his office to monitor Kwiatkowski's account and was in touch with Kwiatkowski throughout the day, obtaining Kwiatkowski's authorization for necessary liquidating trades. By the early hours of Monday, the liquidation was complete. In order to cover his losses, Kwiatkowski was forced to liquidate his securities account and pay an additional $2.7 million in cash. 126 F.Supp.2d at 682.

In all, Kwiatkowski suffered a net loss of $215 million in his currency trading from October 1994 through Monday, March 6, 1995. At trial, Kwiatkowski's expert witness testified that Kwiatkowski could have saved $53 million by liquidating on Friday, March 3. The same expert surmised that $116.5 million would have been saved if Kwiatkowski had liquidated on Wednesday and Thursday, March 1 and 2.

## B. *Proceedings in the District Court*

Of the various federal, state, and common law claims in the complaint, all but the claims for negligence and breach of fiduciary duty were dismissed in August 1997 by Judge Koeltl (who had initially been assigned to the case). By the consent of the parties, Kwiatkowski filed a Second Amended Complaint in October 1998, which re-pleaded the original claims on somewhat different theories. The amended pleading alleged that Bear had failed to give adequate warning about trading risks and adequate advice regarding liquidation of Kwiatkowski's position. Bear again moved for summary judgment on all claims, arguing that under New York law, the duties it owed to a nondiscretionary customer such as Kwiatkowski were limited to the faithful execution of the client's instructions, and did not entail ongoing advice. In November 1999, the district court granted the motion in part, but refused to dismiss the breach of fiduciary duty and negligence claims, citing issues of fact as to whether Bear had undertaken advisory duties notwithstanding that Kwiatkowski's account was at least nominally of the nondiscretionary kind. *Kwiatkowski v. Bear, Stearns & Co., Inc.*, 96 Civ. 4798, 1999 WL 1277245, at *11–*16 (S.D.N.Y. Nov.29, 1999).

The case was reassigned to Judge Marrero, who conducted a jury trial in May 2000. At trial, Kwiatkowski contended that Bear had breached its duties in three ways: [1] Bear failed adequately to advise him about unique risks inherent in his giant currency speculation; [2] Bear failed to provide him with market information and forecasts, generated by Bear personnel, that were more pessimistic about the dollar than views Kwiatkowski was hearing from others at Bear; and [3] Bear should have advised Kwiatkowski well before March 1995 to consider liquidating his position, and specifically should have advised him on Friday, March 3 to liquidate immediately rather than hold on through the weekend.

At the close of evidence, Bear moved for judgment under Fed.R.Civ.P. 50, arguing that it had owed Kwiatkowski no duty to give advice. Bear's motion was denied. As to negligence, the district court instructed the jury (*inter alia*) that the defendants owed Kwiatkowski "a duty to use the same degree of skill and care that other brokers would reasonably use under the same circumstances." Tr. 2283.

The jury found Bear liable on the negligence claim, and awarded Kwiatkowski $111.5 million in damages. It found for Bear on the breach of fiduciary duty claim, and for Sabini on both claims (verdicts from which no appeals have been taken). Bear renewed its motion for judgment as a matter of law on the negligence claim un-

der Rule 50(b), and moved in the alternative for a new trial pursuant to Fed. R.Civ.P. 59.

The district court denied both motions, ruling (*inter alia* ) that the evidence supported the finding of an "entrustment of affairs" to Bear that included "substantial advisory functions," and that the services that Bear provided "embodied the full magnitude of 'handling' Kwiatkowski's accounts, with all the considerable implications that such responsibility entailed." *Kwiatkowski*, 126 F.Supp.2d at 701, 708.

## Discussion

We must decide whether the facts of this case support the legal conclusion that Bear Stearns as broker owed its nondiscretionary customer, Kwiatkowski, a duty of reasonable care that entailed the rendering of market advice and the issuance of risk warnings on an ongoing basis. If so, we must decide whether a reasonable juror could find that Bear breached that duty.

### I

It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions. On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale. The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention. *See, e.g., Press v. Chem. Inv. Servs. Corp.*, 166 F.3d

529, 536 (2d Cir.1999) (broker's fiduciary duty is limited to the "narrow task of consummating the transaction requested"); *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940–41 (2d Cir.1998) (in a nondiscretionary account, "the broker's duties are quite limited," including the duty to obtain client's authorization before making trades and to execute requested trades); *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 947 (S.D.N.Y.1979) (noting that the "scope of affairs entrusted to a broker is generally limited to the completion of a transaction"); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala.1971) ("The relationship of agent and principal only existed between [broker and nondiscretionary customer] when an order to buy or sell was placed, and terminated when the transaction was complete."); *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 952–54 (E.D.Mich.1978) (same; drawing distinction between discretionary and non-discretionary accounts); *accord Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 516–17 (Colo.1986) (observing same distinction, and holding that existence of broad fiduciary duty depends on whether broker has "practical control" of customer's account). As the district court observed, these cases generally are cast in terms of a fiduciary duty, and reflect that a broker owes no such duty to give ongoing advice to the holder of a nondiscretionary account.

The giving of advice triggers no ongoing duty to do so. *See, e.g., Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir.1985) (securities broker had no duty to provide customer with information about stock after purchase was complete); *Leib*, 461 F.Supp. at 953 (broker has no duty to keep nondiscretionary customer abreast of

"financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments"); *Robinson,* 337 F.Supp. at 112 ("[T]he broker has no duty to relay news of political, economic, weather or price changes to his principal, absent an express contract to furnish such information."); *Puckett v. Rufenacht, Bromagen & Hertz, Inc.,* 587 So.2d 273, 280 (Miss.1991) ("If a broker were under a duty to inform all of its customers of every fact which might bear upon any security held by the customer, the broker simply could not physically perform such a duty."); *Walston & Co. v. Miller,* 100 Ariz. 48, 410 P.2d 658, 661 (1966) ("[A]ny continuing duty to furnish all price information and information of all facts likely to affect the market price would be so burdensome as to be unreasonable.").

From these principles, Bear argues that: it had no ongoing duty to give Kwiatkowski financial advice about his dollar speculation; its sole obligation was to "execute [Kwiatkowski's] transactions at the best prices reasonably available and ... offer honest and complete information when recommending [a] purchase or sale"; and it had no "open-ended duty of reasonable behavior, or to provide such investment advice as a trier of fact decides would have been prudent." As Bear points out, Kwiatkowski makes no claim that any of his instructions were improperly carried out, or that he was given dishonest or incomplete information about any trade. Thus, when the district court instructed the jury to evaluate Bear's overall conduct according to whatever a "reasonable broker" would have done under the circumstances, Bear argues, it allowed the jury to enforce advisory obligations that do not exist.

This argument, addressed to the features of nondiscretionary accounts, misses the point. The theory of the case is that this was no ordinary account (an observation that is true enough as far as it goes). Kwiatkowski contends that in the course of dealing, Bear voluntarily undertook additional duties to furnish information and advice, on which he came to rely (as Bear surely knew); that his trading losses were caused or enlarged by Bear's failures to perform those duties; and that Bear's liability arises from generally applicable tort rules requiring professionals to exercise due care in performing whatever services they undertake to provide, as measured against the standard observed by reasonable and prudent members of the profession.

## II

The district court acknowledged the general principles limiting a broker's duties to a nondiscretionary customer: it agreed that "[i]n the ordinary situation, the broker's professional obligation to the customer with respect to any particular investment ends upon the completion of the authorized transaction." *Kwiatkowski,* 126 F.Supp.2d at 691. Moreover, "[a]s regards a nondiscretionary account, the customer retains management and control over investment transactions, determining what purchases and sales to make. For the purposes of assessing the broker's role and ascribing attendant legal duties, each transaction is considered separately." *Id.* at 690 (internal citations omitted). But the court rejected what it called the "mechanical" argument that the nondiscretionary label disposed of Kwiatkowski's claim. *Id.* at 691–92 (noting that if "a mere recitation of bare legal maxims were all there was to this matter, the action would present only an easy, garden-variety dispute"). The court observed that the cases that articulate the general rules also allude to "special circumstances" that may "exempt the particular action from the scope of the general standard." *Id.* at 692.

The court characterized Bear's position as a "per se defense" that a broker's duties to a nondiscretionary customer "not only exclude any obligation to offer advice, but may not even embrace a duty of ordinary, reasonable care." *Id.* at 690. Reviewing principles of contract, negligence, and agency law, as well as case law concerning the broker/client relationship, *see id.* at 690–701, the district court concluded that, on the contrary, "a legal foundation exists which supports application of the duty of care to the broker/customer relationship between Kwiatkowski and Bear Stearns." *Id.* at 700.

The court contrasted the general duty of due care with the duties that arise from the parties' intentional relationship, which the court agreed are limited and narrowly defined:

> [T]he duty of due care arises not by agreements or imposition of the parties governing their relations, but by operation of law. The duty emerges out of a totality of given circumstances and holds the defendant in an action to a standard of conduct designed to protect persons located within a reasonable zone of foreseeability who were injured by a defendant's careless behavior.

*Id.* at 694. The court explained that "contractual commitments cannot serve to excuse carelessness or shield a defendant from liability for injury that a breach of the duty of due care may engender." *Id.* Just as "exceptional conditions" may create fiduciary duties without the parties' "express intent," and notwithstanding a contractual disclaimer, *id.* at 695, the court

reasoned that "extraordinary events" may "support imposition of a duty of reasonable care arising from aspects of the same conduct on the part of the broker," *id.* at 696. Such an extraordinary situation may arise from the "assumption, by promise or partial performance, of certain responsibilities under certain conditions." *Id.* at 698 (citing the example of good samaritan liability) (collecting cases).

The district court further ruled that the breach of the duty of care could "be evidenced by Bear Stearns's failure to provide particular information essential to the affairs entrusted and which under all the circumstances a reasonable broker exercising ordinary care would have supplied to the client." *Id.* at 700–01. The court indicated that a duty of care arose by virtue of the broker-client relationship itself, but also specifically considered that a duty of reasonable care arises when the parties depart from the usual rules of a nondiscretionary account, such as where the broker undertakes performance of additional functions. Consistent with this view, the jury was charged both that Bear had a general duty to behave as a reasonable broker [7] and that the jury should decide what functions Bear undertook and (thereby) had a duty to perform with reasonable care.[8]

Accordingly, the court ruled that the jury's verdict was sustainable on any one of several findings supportable by the record and the charge:

- Bear assumed substantial advisory functions that made it the "handler" of Kwiatkowski's account, *id.* at 708,

---

7. The court instructed the jury that "[a]s brokers in this case, defendants owed plaintiff a duty to use the same degree of skill and care that other brokers would reasonably use under the same circumstances." Tr. 2283.

8. The court instructed the jury that "[i]f you find that defendants owed plaintiff a duty of care, then you must determine whether defen-

dants breached this duty," Tr. 2285, and that "[i]f you find ... that the defendants had a duty to perform particular services as brokers for plaintiff and failed in respect of their dealings with plaintiff to exercise the degree of care of a reasonably prudent and diligent broker under the same circumstances, you must find the defendants were negligent." Tr. 2285–86.

and that amounted to special circumstances sufficient to impose an ongoing duty of reasonable care.[9] *Id.* at 701.

- Even absent special circumstances, Bear breached the standard of care applicable to the ordinary broker/client relationship by the following: Bear's execution of Kwiatkowski's large trades in the fall of 1994 without conducting new risk and suitability analyses, *id.* at 711;[10] possible noncompliance with internal Bear procedures concerning notification to the client of increased risk, *id.* at 713–14, 717; the initial placement of Kwiatkowski's position on the CME rather than the OTC market, *id.* at 712–13; giving overly optimistic advice (specifically, Schoenthal's statement that he could get Kwiatkowski out of the OTC market "on a dime," and Angell's opinion that the dollar was undervalued) in conjunction with the failure to furnish other, negative dollar forecasts,

*id.* at 714–16; and the handling of the liquidation in March 1995.[11]

- Even if Bear had no standing obligation (under ordinary or special circumstances) to provide Kwiatkowski with assistance, Bear nonetheless undertook to do so in connection with the March liquidation, and did so in a manner that was imprudent and that actually worsened Kwiatkowski's situation.[12]

## III

No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts. See, e.g., *Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 510 (2d Cir.1994); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454, 460–61 (9th Cir.1986); *Scott v. Dime Sav. Bank of New York, F.S.B.,* 886 F.Supp. 1073, 1080–81 (S.D.N.Y.1995); *Fustok v. Conticommodity Servs., Inc.,* 618 F.Supp. 1082, 1085–86 (S.D.N.Y.1985); *Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 992

9. According to the court, the jury could have found such a relationship on the basis of (*inter alia* ) Kwiatkowski's access to elite services, *id.* at 702; the frequency of his contacts with Sabini, *id.*; the "extraordinary" size of Kwiatkowski's position, built in part on the strength of advice and encouragement from Bear, *id.*; the "distinct risks and vulnerabilities" Kwiatkowski faced, which prompted Bear executives to advise Kwiatkowski to move the position to the OTC market, *id.* at 703–04; and the fact that Kwiatkowski was advised on three separate occasions against liquidating his account, after he expressed interest in doing so, *id.* at 707–08.

10. When Kwiatkowski opened his 65,000–contract position in the fall of 1994, Bear relied on the documentation and disclosure forms that were on file dating from the opening of Kwiatkowski's account in 1991. The court found an issue of fact as to whether Bear should have undertaken a new risk and suitability analysis. *Id.* at 711.

11. See n. 12, *infra.*

12. The court concluded that "under the exceptional conditions that prevailed here, with Kwiatkowski caught in a position fraught with financial peril, Bear Stearns undertook efforts to respond by providing some assistance," *id.* at 718, and that the jury could find that in that undertaking Bear failed to measure up to the standard of a "reasonably prudent broker encountering the same events," *id.* Witnesses at trial challenged Schoenthal's advice that Kwiatkowski should hold on to his contracts, explaining that if liquidation was necessary, Sunday would be a worse time than Friday afternoon. The court reasoned that this created a factual dispute as to "whether the choices Bear Stearns officials made under these circumstances indicated the exercise of the degree of prudence and skill expected of a broker acting under similar conditions." *Id.*

(S.D.N.Y.1984); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C.1988).

 The claim of negligence in this case, however, presupposes an ongoing duty of reasonable care (i.e., that the broker has obligations between transactions). But in establishing a nondiscretionary account, the parties ordinarily agree and understand that the broker has narrowly defined duties that begin and end with each transaction. We are aware of no authority for the view that, in the ordinary case, a broker may be held to an open-ended duty of reasonable care, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties. Thus, in the ordinary nondiscretionary account, the broker's failure to offer information and advice between transactions cannot constitute negligence.

All of the cases relied on by Kwiatkowski in which brokers have been found liable for their nondiscretionary customers' trading losses involve one or more of the following: unauthorized measures concerning the customer's account (i.e., the account became discretionary-in-fact because the broker effectively assumed control of it); failure to give information material to a particular transaction; violation of a federal or industry rule concerning risk disclosure upon the opening of the account; or advice that was unsound, reckless, ill-formed, or otherwise defective when given. See, e.g., *Conway*, 16 F.3d at 510 (broker liable where he liquidated part of nondiscretionary account in order to satisfy margin call without obtaining client's authorization, where client never received notification that margin requirement had changed); *Vucinich*, 803 F.2d at 459–61 (vacating directed verdict for broker where evidence showed broker may have violated Securities Exchange Act by failing to disclose material facts relating to risk to his unsophisticated client, disre-

garded client's clearly-stated wish to avoid speculative trades, and may effectively have exercised control over the account); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.*, No. 94 Civ. 8301, 2000 WL 1702039, at *26–*28 (S.D.N.Y. Nov.13, 2000) (denying summary judgment for broker on breach of fiduciary duty claim, ruling that issues of fact existed concerning the "true nature of the relationship" between the parties); *Dime Sav. Bank*, 886 F.Supp. at 1080–81 (negligence verdict upheld where broker failed to evaluate client's financial situation before opening margin account, in violation of "suitability rule" of the National Association of Securities Dealers); *Cheng*, 697 F.Supp. at 1227 (negligence claim was adequately stated where it was based on broker's alleged failure to comply with NASD suitability rule).

Kwiatkowski does not claim any unauthorized trading, any omission of information material to a particular transaction, any violation of government or industry regulations concerning risk disclosures at the time he opened his account, or (except for Schoenthal's advice that he not liquidate on Friday, March 3, 1995) any unsound or reckless advice. Indeed (with that exception, discussed infra), Kwiatkowski is in no position to complain about any of these things. He can hardly contend that Bear negligently induced his speculations in the dollar (Kwiatkowski made early profits in excess of $200 million); or that Schoenthal was negligent in advising him to move the position to the OTC market (he claims that Bear was negligent in failing to give him that advice in the first place); or that Schoenthal was negligent in advising him after the late-December loss that the dollar would probably bounce back (Kwiatkowski made about $50 million the following day). Kwiatkowski does not allege that any of this advice was given negligently or in bad faith; he does not

even allege that it was bad advice—nor could he, given the immense profits he made when he acted on it.

In sum, aside from the March liquidation, the claimed negligence is not in the advice that Bear gave, but in advice that Bear did not give. Specifically, Kwiatkowski finds a breach of duty in: [1] Bear's failure to volunteer certain advice, namely the Byers–Taylor prediction in early 1995 that the dollar was likely to fall; [2] Bear's failure to advise him, on an ongoing basis, of risks associated with his dollar speculation; and [3] Bear's negligence in connection with the March 1995 liquidation.

Kwiatkowski does not dispute that in the ordinary case, a broker's failure to offer ongoing, unsolicited advice to a nondiscretionary customer would breach no duty. Kwiatkowski's claim is viable, therefore, only if there is evidence to support his theory that Bear, notwithstanding its limited contractual duties, undertook a substantial and comprehensive advisory role giving rise to a duty on Bear's part to display the "care and skill that a reasonable broker would exercise under the circumstances."

We conclude that the district court's judgment must be reversed because there was insufficient evidence to support the finding that Bear undertook any role triggering a duty to volunteer advice and warnings between transactions, or that Bear was negligent in performing those services it did provide. Liability cannot rest on Bear's failure to give ongoing market advice that it had no duty to give, on Bear's failure to issue warnings that it had no duty to give (concerning risks about which Kwiatkowski surely knew more than anyone), or on Bear's failure to foretell the short-term gyration of the dollar.

### 1. Advice

Kwiatkowski points to the advice he received from Bear, both solicited and unsolicited. There is certainly ample evidence that Kwiatkowski transferred his account to Bear's Private Client Services Group in part to get (as Bear advertised) access to the firm's top financial analysts and experts. And he received it. The record also supports inferences that Bear encouraged Kwiatkowski's betting on the dollar, that he moved half his position to the OTC market on the strength of Schoenthal's advice, that twice he decided against liquidating his position at least in part because of Bear's advice that the dollar was still undervalued, and that he followed Schoenthal's advice against trying to liquidate on the afternoon of Friday, March 3, 1995.[13]

But the giving of advice is an unexceptional feature of the broker-client relationship. W hat little case law there is on the subject makes clear that giving advice on particular occasions does not alter the character of the relationship by triggering an ongoing duty to advise in the future (or between transactions) or to monitor all data potentially relevant to a customer's investment. See, e.g., *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir.1995) (securities broker had no duty to provide customer with information about stock after purchase was complete); *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 953 (E.D.Mich.1978) (broker has no duty to keep nondiscretionary customer abreast of "financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments"); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 112

---

**13.** The record also establishes that Sabini did not inform Kwiatkowski about the February 1995 Byers–Taylor report downgrading their dollar forecast to negative.

(N.D.Ala.1971) ("[T]he broker has no duty to relay news of political, economic, weather or price changes to his principal, absent an express contract to furnish such information."); *Puckett v. Rufenacht, Bromagen & Hertz, Inc.,* 587 So.2d 273, 280 (Miss.1991) (the broker could not possibly perform such a duty); *Walston & Co. v. Miller,* 100 Ariz. 48, 410 P.2d 658, 661 (1966) (same).

A broker may be liable in tort (as noted above) for breach of a duty owed in respect of advice given. But if a broker had a broad duty to furnish a nondiscretionary customer with all advice and information relevant to an investment, then, as the Robinson court observed, the customer could recover damages "merely by proving nontransmission of some fact which, he could testify with the wisdom of hindsight, would have affected his judgment had he learned of it." 337 F.Supp. at 113.

Thus if Bear had a duty to advise Kwiatkowski in early 1995 that the dollar might fall, it could not arise merely because Bear advised him in late 1994 that the dollar might rise. Kwiatkowski characterizes Bear's frequent giving of advice as an "undertaking" that supports a generalized duty of reasonable care to perform ongoing advisory duties not created by contract. T he advisory services that Bear advertised and provided to Kwiatkowski, however, were wholly consistent with his status as a nondiscretionary customer; Kwiatkowski bargained for the expertise of the Private Client Services Group, but he simultaneously signed account agreements making clear that he was solely responsible for his own investments. It was thus obviously contemplated that Kwiatkowski would receive a lot of advice from Bear's senior economists and gurus, and that this advice would not amount to Bear's entrustment with the management of the account. It follows that Kwiatkowski cannot reasonably have believed that once he sought and

Bear gave advice, Bear had become "account handler."

■ Any duty by Bear to offer advice therefore could arise only if the law, under the circumstances of this case, imposes on Bear some special duty as a result of the relationship between the parties—that is, if Kwiatkowski's account deviated from the usual nondiscretionary account in a way that creates a special duty beyond the ordinary duty of reasonable care that applies to a broker's actions in nondiscretionary accounts. The district court alluded to "special circumstances," in particular Kwiatkowski's outsized account, the frequency of broker contacts, and the unique risk run by a private individual speculating in currency on a scale known only to governments of large countries. *Kwiatkowski,* 126 F.Supp.2d at 701–05.

These circumstances made Kwiatkowski's account special, even very special; but these circumstances are not special in a way that transforms the account relationship. The transformative "special circumstances" recognized in the cases are circumstances that render the client dependent—a client who has impaired faculties, or one who has a closer than armslength relationship with the broker, or one who is so lacking in sophistication that de facto control of the account is deemed to rest in the broker. The law thus imposes additional extra-contractual duties on brokers who can take unfair advantage of their customers' incapacity or simplicity. See, e.g., *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l Ltd.,* 251 A.D.2d 137, 674 N.Y.S.2d 648, 649 (App.Div.1998) (referring to the broker's "requisite high degree of dominance and reliance"); *Leib,* 461 F.Supp. at 954 (referring to heightened duties where "broker has usurped actual control," such as a case involving a 77–year–old widow); *cf. Robinson,* 337 F.Supp. at 113 (absent an express advisory

contract, there is no fiduciary duty on part of broker-dealer "unless the customer is infirm or ignorant of business affairs"). See also n. 18, infra.

Kwiatkowski of course is the very opposite of the naive and vulnerable client who is protected by "special circumstances." He was a special customer chiefly by reason of his vast wealth, his trading experience, his business sophistication, and his gluttonous appetite for risk. These factors weigh strongly against—and not at all in favor of—heightened duties on the part of the broker (as suitability rules in other contexts imply [14]). We therefore conclude that the theory of "special circumstances" does not broaden the scope of Bear's undertaking.[15]

In short, there was no permissible basis on which a reasonable jury could find that Bear undertook to provide comprehensive "account-handling" services that would have obliged it to provide unsolicited advice to Kwiatkowski on an ongoing basis; nor was Kwiatkowski's account "special" in a way that would justify imposing extra-contractual duties on Bear absent such an undertaking.

## 2. Risk

When Kwiatkowski opened his account, Bear warned him of the risks of currency trading. Kwiatkowski argues that Bear should have given further specific warnings throughout the relevant period concerning "extraordinary market and liquidity risks" posed by the size of his position, especially in conjunction with market changes and the volatility of the dollar. Kwiatkowski's argument fails because he has not demonstrated that Bear was under an obligation to provide the warnings he claims were omitted, because he grossly understates the warnings Bear in fact issued and the impact such warnings would have had on any reasonable investor, and because (even if Bear failed to give warnings it was obliged to give) as a matter of law, Kwiatkowski's trading losses were not caused by any insufficiency of warnings.

Under the written terms of Kwiatkowski's currency futures account, Bear undertook to serve as "futures commission merchant" ("FCM") (for the trades placed on the CME) and as "OTC dealer" (for the trades placed on the over-the-counter market), and in no other capacity. Bear did not in this case contract to serve in an advisory capacity (at least with respect to Kwiatkowski's futures account), and thus (undisputedly) was neither an "investment adviser" as defined by the Investment Advisers Act of 1940, 15 U.S.C. § 80b–2(a)(11), nor a "commodity trading advis-

---

**14.** *See, e.g.,* 7 U.S.C. §§ 1a(12), 2 (exempting from some Commodity Exchange Act coverage certain transactions with individuals whose assets exceed $10,000,000); 17 C.F.R. § 1.55(f) (certain risk disclosures not required prior to opening commodity futures account if customer is a natural person with total assets exceeding $10,000,000); *cf.* NASD Manual, Rule 2310 Recommendations to Customers (Suitability) (certain securities broker due diligence requirements not applicable to customers with assets of greater than $50 million).

**15.** On appeal, Kwiatkowski does not rely on any theory of "special circumstances" apart from the undertaking argument. It is also not clear to what extent the district court actually conceived of special circumstances as an independent basis, aside from the undertaking theory, for imputing to Bear an ongoing duty of reasonable care. For example, while the district court referred several times to the "extraordinary" or "exceptional" facts of this case, it elsewhere stated that the same result would obtain "whether the amount in controversy implicated hundreds of dollars or hundreds of millions." *Kwiatkowski,* 126 F.Supp.2d at 726. In any event, the "special circumstances" rationale is the only exception recognized to the rule on which Bear relies to claim judgment as a matter of law, and Kwiatkowski is not a candidate for that special status.

er" as defined by the Commodities Exchange Act, 7 U.S.C. § 1a(6).

As an FCM, Bear was subject to regulations promulgated by the Commmodity Futures Trading Commission ("CFTC") and by the National Futures Association ("NFA"), a self-regulatory organization registered with the CFTC. (Bear is an NFA member, as all FCMs must be.) At the time Kwiatkowski opened his account, Bear as FMC had certain obligations: pursuant to CFTC Rule 1.55, Bear was to provide Kwiatkowski with a detailed risk disclosure statement, see 17 C.F.R. § 1.55(a),(b); and pursuant to NFA Compliance Rule 2–30, Bear was to obtain from Kwiatkowski a variety of personal information, including his net worth, estimated annual income, and previous experience in futures trading. It is undisputed that Bear did these things.

■ But, as Kwiatkowski argues, there is trial evidence to show that industry standards—even Bear's own internal policies—may have demanded something more. For example, New York Stock Exchange ("NYSE") Rule 405, the "know your customer" rule, provides (inter alia) that the broker must "use due diligence to learn the essential facts relative to every customer, every order, every cash or mar-

gin account accepted or carried. . . ." *Kwiatkowski*, 126 F.Supp.2d at 711 n. 40 (emphasis added). Although Rule 405 does not apply to commodities brokers, Sabini testified that in practice Bear adhered to that rule in the commodities context. Moreover, Sabini understood the rule to require the broker to undertake a new risk analysis every time a customer's investment position materially changed. *Id.* at 711 n. 41. Kwiatkowski argues further that the minimum requirements established by NFA Rule 2–30 understate industry practice,[16] and he cites administrative decisions of the CFTC indicating that FCMs, in certain circumstances (depending on the nature of the broker-client relationship), may have risk-disclosure obligations that go beyond CFTC Rule 1.55.[17] In sum, Kwiatkowski argues that Bear's negligence is evidenced by industry practice and internal Bear rules indicating that Bear should have provided more than it did in the way of risk warnings and account monitoring.

We disagree. First, the CFTC cases on which Kwiatkowski relies are exemplars of the "special circumstances" that some courts have cited to justify departure from ordinary rules—circumstances, as we noted above, that have nothing to do with Kwiatkowski.[18]

---

**16.** The NFA has filed an *amicus curiae* brief arguing, on behalf of Bear, that the disclosure obligations imposed by its Rule 2–30 exist only at the time the account is opened.

**17.** Kwiatkowski also points out that the CFTC has made clear that Rule 1.55 was intended merely to ensure that customers would be advised of the risks inherent in trading commodity futures, and does not necessarily relieve an FCM of obligations that may arise under state or common law. See, e.g., 63 Fed.Reg. 8566, 8568–69, 1998 WL 66438 (C.F.T.C. Feb. 20, 1998). The administrative cases cited by Kwiatkowski can be understood to reflect this principle; but they provide no support for inferring such obligations with respect to a sophisticated customer such as Kwiatkowski. See n. 18, infra.

**18.** Sec, e.g., *Gittemeier v. Smith Barney, Harris Upham & Co., Inc.,* R80–1255–81–182, 1983 WL 29719, at *7 (C.F.T.C. Nov. 30, 1983), ruling that the basic disclosure statement under Rule 1.55 was "not enough" where the customer was a novice and unsophisticated trader who wished to trade contracts in ten-bag U.S. silver coins futures, and the broker failed to advise him that the particular market was thin, infrequently traded, and had days when no trades occurred at all (distinguishing the standard disclosure as appropriate for the "usual or basic risks attendant to a normal commodity futures market, i.e., a thick or thriving market involving competitive prices, a reasonable level of volume and a high open interest"); see also *Levitt v. Int'l Trading Group, Ltd.,* R81–1010–82–394, 1985 WL 55211, at *5 (C.F.T.C. July 30, 1985)

Second, deviation from industry or internal standards for monitoring risk and suitability does not necessarily amount to the breach of a duty owed to Kwiatkowski. The general rule (as we have emphasized) is that commodities brokers do not owe nondiscretionary clients ongoing advisory or account-monitoring duties, such as the duty to warn of changes in market conditions or other information that can impact the client's investments.

As a policy matter, it makes no sense to discourage the adoption of higher standards than the law requires by treating them as predicates for liability. Courts therefore have sensibly declined to infer legal duties from internal "house rules" or industry norms that advocate greater vigilance than otherwise required by law. See, e.g., *Farmland Indus. v. Frazier–Parrott Commodities, Inc.*, 871 F.2d 1402, 1407 (8th Cir.1989) ("[F]ailure to follow [internal policies and procedures] will not give rise to a cause of action in the absence of independent facts establishing fraud.") (citation omitted); *J.E. Hoetger & Co. v. Ascencio*, 572 F.Supp. 814, 822 (E.D.Mich. 1983) (observing that to allow private cause of action based on firm's violation of internal rules "would impose the greatest additional liability on those firms policing themselves rigorously ... effectively punishing the diligent and favoring the lax"); see also *Puckett*, 587 So.2d at 282 (collecting cases).

Kwiatkowski cites no competing authority; indeed he does not argue directly that noncompliance with internal rules or industry standards is a basis for liability. Kwiatkowski instead relies on such noncompliance as evidence of Bear's overall failure to exercise due care. The district

court agreed. *Kwiatkowski*, 126 F.Supp.2d at 711–12.

It may be that noncompliance with internal standards could be evidence of a failure to exercise due care, assuming however a duty as to which due care must be exercised. But the assertion that Bear had an ongoing duty to exercise "due care" or "behave like a reasonable broker," breach of which could be evidenced by noncompliance with internal rules, cannot be squared with the cases holding that a broker's obligations to a nondiscretionary client arise and are satisfied transaction-by-transaction. And, as illustrated above, there is no basis in this case for a more comprehensive duty on Bear's part to monitor Kwiatkowski's account between transactions. He cites the frequent advice from senior economists at Bear. But giving advice is consistent with the limited duties owed by a broker to the holder of a nondiscretionary account. And though Kwiatkowski's account was enormous, and he could therefore elicit such advice more frequently and from the most senior persons in the firm, the service rendered by Bear was not different in kind.

Kwiatkowski can succeed therefore only if the district court was correct that some "special circumstances" justify imposing extraordinary duties on Bear. We have already explained why Kwiatkowski is the very opposite of the type of client protected by that very limited doctrine. We therefore conclude that Bear had no ongoing duty to give advice and warnings concerning his investments.

Kwiatkowski contends that Bear did "literally nothing" to advise him of the distinct risks he was facing. This claim whol-

---

(involving a broker's affirmative, negligent misrepresentation concerning whether the equity in the client's account was sufficient to meet a margin requirement); *Doud v. Shearson Loeb Rhoades, Inc.*, R80–313–80–600,

1985 WL 55301 (C.F.T.C. Sept. 9, 1985) (involving discretionary-in-fact account where broker made all trading decisions for unsophisticated customer).

ly ignores Bear's advice in late 1994 that Kwiatkowski was too visible on the CME because of the size of his position, and that he should move to the OTC market generally favored by governments and banks. I t is hard to conceive of a clearer signal to an experienced investor that the account is exposed and unique.[19]

Finally, even if one could say that Bear breached a duty to advise Kwiatkowski of certain additional risks, that breach could not (as a matter of law) have caused Kwiatkowski's losses. Kwiatkowski could have been under no illusions about his situation after January 19, 1995. In the three weeks preceding that date, he had suffered single-day losses of $112 million, $98 million, and $70 million. Kwiatkowski could not have mistaken his trading account for an annuity. Yet, despite these blows, he could have walked away on January 19, 1995 with a net profit of $34 million from three months of trading. At this point, when Kwiatkowski decided to press on, there was nothing that Bear could tell him about the risks that he did not know from experience.

Kwiatkowski has two further points that merit brief consideration. First, Kwiatkowski cites the failure of the firm to mail him the February 1995 Byers–Taylor report downgrading the dollar to "negative." Assuming that Kwiatkowski would have read and been influenced by the report, and assuming further that Bear was obliged to send him that particular report, this argument misconceives the nature of

the risk that Kwiatkowski faced-and welcomed. Kwiatkowski knew that the dollar would experience short-term "ups and downs," and he certainly knew that market liquidity was variable and that he could experience massive losses quickly. He made and lost millions of dollars virtually every day. Yet Kwiatkowski nevertheless built a position that exposed him to disaster at any moment by reason of developments anywhere and everywhere on earth that could not have been predicted by Bear even if it had volunteered all of its information and predictions. Kwiatkowski knew—at the very least, he should have known after December 28, 1995 (the day he lost $112 million)—that even within a long-term upswing, a severe enough downtick could wipe him out. Accordingly, it would be pure speculation to find that the delivery of one long-term forecast would have rendered Kwiatkowski risk-averse.

Kwiatkowski also argues that he was misled concerning his ability to liquidate quickly by Schoenthal's statement that he could get out of the OTC market "on a dime." This argument cannot bear the weight Kwiatkowski puts on it. There is no dispute that Schoenthal's advice was sound: The OTC market was preferable to the CME (though, as it happened, Kwiatkowski only half-followed this advice). Nothing suggests that Kwiatkowski fared worse because of this move than he would have if he had left his contracts on the CME.[20] He could not reasonably have believed that "on a dime" meant that billions

---

19. The fact that Kwiatkowski only partially accepted this advice (he moved half his contracts to the OTC) also defeats any inference that he entrusted account-shepherding functions to Bear that could trigger on ongoing duty of reasonable care. See, e.g., *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1029 (4th Cir.1997) (customer's rejection of broker's advice on some occasions demonstrated that customer made independent investment decisions).

20. Kwiatkowski also argues that negligence could be found in Bear's failure to advise him at the outset that he should place his position on the OTC market. This omission of advice, even if negligent, is equally devoid of causal significance. At the time Bear advised Kwiatkowski to move to the OTC market (thus correcting for any "error" in placing the position on the CME to begin with), Kwiatkowski had made more than $200 million in profits.

of dollars in contracts could be folded instantaneously and without loss. The phrase is hyperbole. No one could reasonably bet millions on the idea that it meant immediate liquidity all the time, certainly not Kwiatkowski after he had been warned over the holidays that liquidation sometimes could be difficult even on the OTC market.[21]

### 3. Liquidation

Kwiatkowski's remaining argument is that Bear negligently handled the liquidation of his account in March 1995. He contends first that Bear should have advised him to liquidate no later than Wednesday, March 1, in order to avoid being forced into liquidation by margin calls over the ensuing weekend. His expert testified that Kwiatkowski's risk of loss was ten times greater in March 1995 than it had been in November 1994. Kwiatkowski also claims that Bear should have advised him in the weeks leading up to the March liquidation that his positions were much too large given the volatility of the dollar. Finally, he charges negligence in Bear's advice that Friday afternoon, March 3, was a dangerous time to start liquidating. He cites expert testimony that it is well-known in the industry that Sunday in New York (when only the Asian markets are open) is a worse time to liquidate than Friday afternoon, when American markets are still open. On this basis, Kwiatkowski contends that it was "foreseeable" to Bear that as Kwiatkowski's position deteriorated over the weekend, he would encounter even more difficulty liquidating in a relatively illiquid market, and that as a result hi s effort to exit his massive position on Sunday had proportionately greater impact on the price of the dollar, driving it downward and further exacerbating Kwiatkowski's losses.

Kwiatkowski's expert testified that Kwiatkowski would have saved $116.5 million if the position had been liquidated on Wednesday, March 1; $53 million, if it had been liquidated on Friday, March 3. The jury's damages award ($111.5 million) roughly approximates the former figure.

Kwiatkowski's arguments concerning the liquidation depend on the premise that, at various times, Bear knew or should have known whether in the course of a day or two the dollar would go up or go down. Wholly aside from whether Bear was obliged to give advice at all, the idea that Bear should have advised Kwiatkowski in February to exit the market because of the dollar's "volatility" implies knowledge on Bear's part that the dollar's volatility would work to Kwiatkowski's disadvantage. If the dollar had gone up, Kwiatkowski would of course have profited from volatility, as he had richly done in the past.

The same applies to the March liquidation. Assuming that Bear did undertake to assist Kwiatkowski and guide him through the liquidation, there is no evidence of negligence in that process. T he notion that Bear negligently failed to advise a Wednesday liquidation in order to avoid a forced weekend liquidation presupposes that Bear knew that liquidation would be forced over the weekend. But there is no evidence that Bear knew this; no one could. There is evidence that Sunday afternoon is a worse time to liquidate a large position than Friday afternoon, but there is no evidence that Bear knew better than Kwiatkowski whether he would be forced to liquidate at all. Kwiatkowski was well aware, as he testified at trial, that the dollar would experience "ups and downs" in the short term. There is no evidence that Bear knew better than Kwi-

21. *See* n. 4, *supra*.

atkowski whether the dollar would go up or down between Friday and Monday. Indeed, there can be no such evidence; it is the nature of markets to go up and down. Schoenthal's advice on Friday afternoon was not that Sunday would be a better time to liquidate than Friday; his advice (as Kwiatkowski himself testified) was that the market "may improve next week." Tr. 516.[22] There is no suggestion that Schoenthal failed to exercise reasonable care in forming or expressing that view; Kwiatkowski had no reasonable basis for relying on it, if indeed he did; and the fact that Schoenthal turned out to be wrong does not imply negligence. See, e.g., *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 824–25 (10th Cir.1986) ("Regarding trading advice, brokers cannot be liable for honest opinions that turn out to be wrong. Otherwise brokers would refuse to take discretionary accounts and would refuse to advise on nondiscretionary accounts."); *cf. In re Bank of New York*, 35 N.Y.2d 512, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700, 704 (1974) (prescience not required of trustee in investment decisions).

### Conclusion

For the reasons stated, we reverse the judgment of the district court and remand for entry of judgment dismissing the complaint.

22. *See* n. 6, *supra*. Kwiatkowski also argues that Bear should have advised him that "the liquidity situation would certainly worsen through the weekend." In light of Kwiatkowski's sophistication and his specific awareness that the market experienced variable liquidity, we think it was not unreasonable for Bear to omit a special warning that some markets close on the weekends.