Evelyn A. SCOTT and Leon Scott, Plaintiffs,

v.

The DIME SAVINGS BANK OF NEW YORK, FSB, Defendant.

No. 88 Civ. 2298 (DC).

United States District Court, S.D. New York.

March 28, 1995.

As Amended May 15, 1995.

Leon Scott, New Rochelle, NY for plaintiff Evelyn A. Scott, pro se.

Douglas E. Barzelay, The Dime Sav. Bank of New York, FSB by Michael P. Amodio, Uniondale, NY, for defendant.

CHIN, District Judge.

On January 17, 1995, following a six-day trial in this case, the jury returned a verdict in favor of defendant The Dime Savings Bank of New York, FSB (the "Dime") on the fraud claim and in favor of plaintiffs Evelyn A. Scott and Leon Scott (the "Scotts") on the breach of fiduciary duty and negligence claims. The jury awarded the Scotts damages of $36,000, and found, with respect to the negligence claim, that the Scotts were 54% at fault and that the Dime was 46% at fault.

Before the Court is the Dime's motion for judgment as a matter of law dismissing the fiduciary duty and negligence claims and for summary judgment on its counterclaim for foreclosure. Although the Dime seeks "summary judgment" on its counterclaim, in fact, of course, the case has been tried. The parties were told at or prior to trial that the evidence presented at trial would be considered by me in ruling on the Dime's counterclaim for foreclosure. The parties have been given an opportunity following the trial to submit additional materials relating to the counterclaim,[1] and I find that no additional evidentiary hearing is required.

### The Facts

In 1987, after unsuccessfully applying to two other banks for a $5,000 loan (Tr. 17–19; PX 144), Leon Scott ("Mr. Scott") went to the Dime branch in Mamaroneck, New York to inquire about getting a $5,000 loan for him and his mother, Evelyn A. Scott ("Mrs. Scott"). (Tr. 22). Mr. Scott met with Shirley Traendly of the Dime on several occasions. (Tr. 23–24). The first time, he told her that he was interested in a $5,000 loan; she asked what kind of security the Scotts had; he responded that they had a house, "free and clear"; she said she was "pretty sure" that they could get a $5,000 loan, and she told him that they could get a larger loan if they wanted. (Tr. 24–25).[2] Mr. Scott also testified that Traendly spoke to him about investing the proceeds of the loan. (Tr. 30).[3]

On or about June 1, 1987, with her son acting as her attorney-in-fact, Mrs. Scott borrowed $100,000 from the Dime, mortgaging her house as security. (Tr. 30, 33, 37, 40–41, 48, 66, 181; DX D, E).

At some point on one of his visits to the Dime, Mr. Scott saw a sign at the branch about certain investments that paid 12½% interest. (Tr. 25). He spoke with David Cruz, an employee of the Dime, who offered to send Mr. Scott some information regarding investments. (Tr. 25–26). Cruz sent Mr. Scott a letter on Dime letterhead stating in part as follows:

Here at The Dime Savings Bank of N.Y., we try to help you in every way we can. We offer a wide variety of high interest bearing plans, plus plans with safety, through the Dime Agency.

(PX 50). Cruz signed the letter as a "Financial Services Consultant." He testified at trial and described the letter as "[a] canvassing letter, called a hook." (Tr. 291). Mr. Scott received the letter before he took out the loan. (Tr. 27).

Mr. Scott also had at least one conversation with Sebastian Bulfamante at a Dime branch about different types of investments. (Tr. 31). At that time, Bulfamante was a "dual" employee who was employed by both the Dime and a company called Invest. (Tr. 260–61). Invest was a securities brokerage firm that had contracted to provide brokers and brokerage services to the Dime. (Tr. 261). In 1987, Bulfamante had a desk located inside the Dime branch. (Tr. 273). He was paid, strictly on a commission basis, by both the Dime and Invest. (Tr. 273–74).

Invest and Dime were required by their contract to keep their respective businesses in "strict and total separation ... so as not to lead to confusion between the business conducted by [the Dime] and the business conducted by [Invest] through the operation of the Invest Centers located at [the Dime's] branches." (PX 261, ¶ 14). In fact, however, there was some confusion.

The Invest sign and desks were located within the Dime branch and the "dual" em-

---

1. The Dime has submitted the affidavit of Celia Hall, which lays out the details relating to the Scotts' default on their mortgage. Mr. Scott has submitted additional materials as well, but he has not disputed the facts set forth by Ms. Hall.

2. Traendly worked strictly on a commission basis in 1987. (Tr. 321).

3. The Dime argues that Mr. Scott's testimony at trial was contradicted by his deposition testimony. The jury, however, was entitled to accept Mr. Scott's trial testimony. He also testified that he was sick from the flu when his deposition was taken, that he did not understand some of the questions at his deposition, and that he was not represented by a lawyer at the deposition. (Tr. 173, 206, 212).

ployees operated out of the Dime branches. (Tr. 273, 276, 368, 395). At trial, Cruz testified that he thought he was a "dual employee," but he was not sure, and he noted that his employment status "was a little confusing at the time." (Tr. 294). Although Bulfamante's business card stated that he was an Invest Representative, it gave his address as "The Dime Savings Bank of New York, FSB...." (PX 41). Bulfamante testified that he met with Mr. Scott "to introduce him to the Invest and Dime agency products other than the bank products." (Tr. 262). Mr. Scott also testified that he had a conversation—at a Dime branch—with George Harrienger, a manager of Invest and a dual employee, during which Harrienger told him that he could make 20 to 25% by investing the proceeds of a loan. (Tr. 69–70, 420).

Non-dual employees of the Dime were trained or instructed to refer clients to dual employees, *i.e.*, the employees who worked for both the Dime and Invest. (Tr. 451). As Harrienger testified:

> The system was if we had people that came in and expressed an interest in investing in something other than banks—and, frankly, there were a lot of them because there was a lot of talk about Ginny Maes and mutual funds—rather then sending them out the door to Merrill Lynch or E.F. Hutton, they would send them over to one of our [Invest] representatives to get prudent advice.
>
> At that point in time the person would be either walked over or referred over, and a phone call would be made.

(Tr. 451–52).

On June 16, 1987, approximately two weeks after the loan closed, Mr. Scott opened a trading account with Invest. (DX A). The account was opened as a cash account, but was converted in August 1987 to a margin account, which permitted Mr. Scott to purchase stock by borrowing against his existing portfolio of stocks. (Tr. 360). Although it was apparently Mr. Scott's idea to convert from a cash to a margin account, neither

James McPartland (the dual employee responsible for Mr. Scott's account) nor anyone else at Invest made any inquiry into Mr. Scott's suitability to trade on a margin basis. (Tr. 408–09). McPartland acknowledged that clients were required to have the financial ability to meet losses to trade on a margin basis. (Tr. 409–10). Indeed, before a margin account could be opened, someone at Invest headquarters "downtown" would have to "sign off on it." (Tr. 411).[4]

Mr. Scott invested some $52,000 of his mother's money in the stock market through Invest. (Tr. 185). Eventually, his investments started losing money, but Mr. Scott testified that Invest kept telling him "that the stock market was going to reach 3,000 by Christmas and that the whole thing was really booming." (Tr. 82). At one point, McPartland went away on vacation and Harrienger was supposed to cover for him. (Tr. 126–27). According to Mr. Scott, however, Harrienger was "overloaded," and when McPartland returned, he was unable to handle everything that Harrienger "dumped" on him. (Tr. 129, 131). As a consequence, Mr. Scott testified, McPartland was unable to make the trades that Mr. Scott wanted him to make. (Tr. 131).

On October 19, 1987, the stock market "crash[ed]," and Mr. Scott's account with Invest was "wiped out." (Tr. 129, 133).

Dime's mortgage on Mrs. Scott's home is a first mortgage. (Hall Aff. ¶ 3). She has been in default of her obligations under the mortgage since June 1, 1988. (*Id.*). The loan was called in 1988 and again in 1991, but the Dime has refrained from pursuing foreclosure pending resolution of the Scotts' claims against it. (*Id.* ¶ 8). As of February 6, 1995 (the date the Hall Affidavit was executed), Mrs. Scott owed the Dime $110,893.40 in principal, interest of $62,773.79, late charges of $2,399.36, and escrow amounts of $34,043.37 (which were advanced for real estate taxes and insurance). (*Id.* ¶ 9).

---

**4.** McPartland also worked on a commission basis. He testified that every trade generated a commission of between 1 and 1½%, that Mr. Scott's trades generated at least $5,000 in com-

missions, and that of that amount approximately $3,500 went to Invest and $1,500 went to him. (Tr. 402–04).

The Dime has represented to the Court that in the event it takes title to Mrs. Scott's home, it will not evict her, but instead will establish a life tenancy for her. (Amodio Aff. ¶ 25).

### Prior Proceedings

This *pro se* action was commenced in 1988 against the Dime and Invest by the Scotts, with Mr. Scott representing himself and his mother, who apparently is 97 years old.[5] At some point, the Scotts settled their claims against Invest, and Invest was dismissed from the case. By order dated August 23, 1993, this Court (Leisure, J.) gave the Dime leave to assert a counterclaim for foreclosure of its mortgage.

The Scotts' claims against the Dime were tried over the course of six days in January 1995. Mr. Scott, who is not an attorney, appeared *pro se* and also represented his mother, who did not testify and did not attend the trial. Although the Scotts had asserted 13 claims prior to trial (Tr. 91), I determined that these claims were duplicative and could be organized into three claims: fraud, breach of fiduciary duty, and negligence. I advised the parties that I would only charge the jury on those three claims. (Tr. 91, 482).

At the conclusion of the evidence, I decided not to charge the jury on punitive damages, for I saw no basis for an award of punitive damages. (Tr. 482). The jury was charged, however, on the claims of fraud, breach of fiduciary duty, and negligence.

The jury returned a verdict on January 17, 1995, finding against the Scotts of the fraud claim and against the Dime on the breach of fiduciary duty and negligence claims. The jury awarded damages of $36,000. It also found, with respect to the negligence claim, that plaintiffs were 54% at fault and that defendant was 46% at fault.

### Discussion

**A. The Motion for Judgment as a Matter of Law**

#### 1. Applicable Standards

A jury verdict is not to be set aside and judgment entered as a matter of law pursuant to Fed.R.Civ.P. 50(b) unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached." *Samuels v. Air Trans. Local 504*, 992 F.2d 12, 14 (2d Cir.1993) (*quoting Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)). In considering a Rule 50(b) motion, a trial court "must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels*, 992 F.2d at 16. Judgment notwithstanding the verdict is to be entered only where there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980); *accord Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir.1994).[6]

In the present case, the Dime makes two arguments in support of its motion for judgment as a matter of law. First, it contends that the breach of fiduciary duty claim should be dismissed because there was no evidence

---

5. In 1987, she was 89 years old. (Tr. 51).

6. Rule 50(b) provides that "[w]henever a motion for judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, ... [s]uch a motion may be renewed" after the return of a verdict, but no later than ten days after entry of judgment. *Hilord Chemical Corp. v. Ricoh Electronics, Inc.*, 875 F.2d 32, 37 (2d Cir.1989) ("with rare exception, a motion for [judgment as a matter of law] made at the close of plaintiff's case must be renewed at the close of all the evidence"); *see Varda, Inc. v. Ins. Co. of N. America*, 45 F.3d 634, 638 (2d Cir.1995) ("To preserve for appeal a challenge to the denial of a pre-verdict motion for judgment as a matter of law, a movant must renew that motion after the verdict."). Here, although the Dime did not explicitly renew its motion at the close of the evidence (Tr. 477–86), I stated on the record after the close of the evidence that I was "reserving decision on the defendant's motion for judgment as a matter of law." (Tr. 482). Hence, the Dime is deemed to have renewed its motion at the close of the evidence.

to support the jury's finding of a fiduciary relationship between the Dime and the Scotts. Instead, the Dime contends that the evidence showed that the relationship was merely a debtor-creditor relationship, which is insufficient to support a breach of fiduciary duty claim. (Def.Mem. at 5–8). Second, the Dime argues that the jury's finding of negligence must also be set aside because its relationship with the Scotts was contractual in nature and a cause of action for negligence cannot be based on breach of a contractual duty, and that the Dime owed no duty to the Scotts as borrowers with respect to the underwriting of the loan. (Def.Mem. at 4–5).

### 2. *The Breach of Fiduciary Duty Claim*

■ Under New York law, " '[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (*quoting* Restatement (Second) of Torts § 874 cmt. a (1979)). The existence of a fiduciary relationship cannot be determined "by recourse to rigid formulas"; rather, "New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1231 (S.D.N.Y.1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir.1992).

■ The Dime correctly points out that the legal relationship between a borrower and a bank is a debtor-creditor relationship that in and of itself does not create a fiduciary relationship. (Def.Mem. at 5–6) (*citing Bank Leumi Trust Co. v. Block 3102 Corp.*, 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 301 (1st Dep't 1992), and *Southern Fed. Sav. & Loan Ass'n v. 21–26 East 105th St. Associ-*

*ates*, 145 B.R. 375, 384 (S.D.N.Y.1991), *aff'd mem.*, 978 F.2d 706 (2d Cir.1992)). The jury, however, was so instructed in my charge,[7] and there was evidence in the record to support a finding that the relationship between the Dime and the Scotts here was not the usual relationship between a bank and borrower, but that a fiduciary relationship developed between them.

Indeed, the jury could have found that the Scotts relationship with the Dime went well beyond the usual debtor-creditor relationship that exists between a bank and a customer, as the record contained evidence that the Dime (i) encouraged the Scotts to borrow $100,000 when they only wanted to borrow $5,000, as the result of which the Dime received fees and interest as well as a mortgage on Mrs. Scott's house, (ii) induced the Scotts to invest a substantial part of that money through its affiliate, Invest, and (iii) participated (through Invest) with Mr. Scott as he engaged in stock purchases and sales, which generated commissions that were shared by the Dime and Invest. In these circumstances, the jury reasonably could have found that the Scotts "reposed trust or confidence" in the Dime, and that the Dime gained "a resulting superiority or influence" over them. *Litton Industries*, 767 F.Supp. at 1231.

■ Mr. Scott sought to assert a claim in this case under the Glass–Steagall Act— "[t]hose provisions of the Banking Act of 1933 that mandated a separation of the commercial and investment banking industries." *Securities Industry Ass'n v. Board of Governors of Federal Reserve System*, 716 F.2d 92, 95 (2d Cir.1983), *aff'd*, 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). *See generally Securities Industry Ass'n v. Board of Governors of Federal Reserve System*, 839 F.2d 47 (2d Cir.), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 931 (1988). No private cause of action may be brought under

---

7. The jury was charged as follows:

   [K]eep in mind that the usual relationship between bank and customer is that of a creditor and debtor, and that a debtor-creditor relationship in itself is not enough to create a fiduciary relationship.

   The mere fact that a customer may borrow money from a bank does not create a fiduciary

relationship. In special circumstances, however, a fiduciary relationship will arise between a bank and a customer if there is a confidence placed in the bank that gives it an advantage in dealing with the customer who is placing his trust in the bank. . . .

(Tr. 544).

the Glass–Steagall Act,[8] however, and hence to the Scotts' purported claims under the Glass–Steagall Act were not given to the jury to consider. Nonetheless, the Scotts' reliance on the Glass–Steagall Act is not completely misplaced, for this case is a perfect example of the need for some separation between banking and the selling of securities.

In *Investment Co. Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), the Supreme Court reviewed the objectives of the Glass–Steagall Act and observed that:

> Congress was also concerned that bank depositors might suffer losses on investments that they purchased in reliance on the relationship between the bank and its [securities] affiliate.... Congress feared that the promotional needs of investment banking might lead commercial banks to lend their reputation for prudence and restraint to the enterprise of selling stocks and securities.... There was also perceived the danger that when commercial banks were subject to the promotional demands of investment banking, *they might be tempted to make loans to customers with the expectation that the loan would facilitate the purchase of stocks and securities....*

401 U.S. at 631–32, 91 S.Ct. at 1099 (footnotes omitted) (emphasis added).

Here, the Dime had entered into a joint venture with Invest specifically to "facilitate the purchase of stocks and securities" by its banking customers. The Dime set up Invest in its branches, giving Invest desks and signs within its branches. Dime employees were trained to direct banking customers who were interested in making investments to "dual employees" of the Dime and Invest whose responsibility was to promote certain investment products, so that these customers would not go "out the door to Merrill Lynch or E.F. Hutton." (Tr. 451–52). Bulfamante's business card made explicit reference to the Dime. (PX 41). The "dual employees" worked strictly on a commission basis,[9] and the Dime received part of commissions generated by securities trades made by Invest. The Dime certainly lent its "reputation ... to the enterprise of selling stocks and securities." *See* 401 U.S. at 632, 91 S.Ct. at 1099.

Of course, I need not reach the question of whether the Dime violated the Glass–Steagall Act or any other banking laws, and I do not. However, the jury was entitled to find that a fiduciary relationship was created by the manner in which the Dime (i) extended credit to the Scotts, (ii) then used promotional devices—including what Cruz referred to as a "hook"—to persuade the Scotts to invest $52,000 of the borrowed money in the stock market through Invest, a company affiliated with the Dime and with whom the Dime was sharing profits, and (iii) then continued to work with and advise the Scotts on their purchases and sales of stock through Invest and the "dual" employees who were employed by both the Dime and Invest.

Moreover, under New York law, stockbrokers may owe fiduciary duties to their customers. *See, e.g., Fustok v. Conticommodity Services, Inc.*, 618 F.Supp. 1082, 1085 (S.D.N.Y.1985) (investor could maintain action against commodities broker "for breach of fiduciary duty based upon the principal/agent status which the common law applies to a broker/customer relationship"); *Jaksich v. Thomson McKinnon Sec. Inc.*, 582 F.Supp. 485, 502 (S.D.N.Y.1984) ("Under New York law, brokers maintain fiduciary duties to their customers...."). Hence, the jury could have found that Invest owed fiduciary duties to its customer, Mr. Scott. In view of the evidence of the relationship between the Dime and Invest, including the undisputed evidence that the Invest representatives were "dual" employees of both the Dime and Invest, the jury was also entitled to find that Invest and the "dual" employees who were working with and advising Mr.

---

8. *Russell v. Continental Illinois Nat'l Bank & Trust Co.*, 479 F.2d 131 (7th Cir.), *cert. denied*, 414 U.S. 1040, 94 S.Ct. 541, 38 L.Ed.2d 331 (1973). *See generally Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 417–21, 85 S.Ct. 551, 555–58, 13 L.Ed.2d 386 (1965).

9. *See* 401 U.S. at 631, 91 S.Ct. at 1099 (in discussing purposes behind Glass–Steagall Act, the Court also noted that "the bank's salesman's interest might impair its ability to function as an impartial source of credit").

Scott were agents of the Dime and that therefore the Dime was responsible for their actions.[10]

Although the Dime does not address the issue of whether, assuming the existence of a fiduciary relationship, there was a breach of its fiduciary duties, I note that the record contained evidence to support the jury's finding that the Dime did breach its fiduciary obligations to the Scotts by failing to act in an ordinarily prudent and reasonable manner and violating the trust and confidence that the Scotts had placed in them.[11] That evidence included: Mr. Scott's testimony that Dime and Invest employees encouraged him to make investments through Invest; the admitted failure of Invest (and consequently the Dime) to make any investigation into Mr. Scott's suitability to invest in the stock market on a margin basis; the evidence that the Dime effectively gave Mr. Scott the opportunity to squander away $52,000 of his mother's money; and the testimony that the account was poorly handled while McPartland was away and after he returned.

In sum, I cannot say that the jury's verdict on the breach of fiduciary duty claim "could only have been the result of sheer surmise and conjecture." *Mattivi*, 618 F.2d at 168. Accordingly, the jury's verdict in this respect is sustained.

### 3. *The Negligence Claim*

█ The Dime argues that the negligence claim must be dismissed as a matter of law

because plaintiffs' "main relationship" with the Dime was based on the mortgage and note and therefore is contractual. (Def.Mem. at 4–5). That argument, however, must be rejected, for it ignores the substantial evidence in the record, as discussed above, that the relationship between the Dime and the Scotts went well beyond the relationship of creditor and debtor. Again, the record contained evidence showing not only that the Dime lent the Scotts money, but that the Dime encouraged the Scotts to invest through Invest, and that "dual" employees who were employees of both the Dime and Invest acted as the Scotts' brokers. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697 F.Supp. 1224 (D.D.C.1988) ("It is clear from the case law that a stockbroker can be held liable to his client for negligence."); *Fustok,* 618 F.Supp. at 1085 (holding that negligence claim could be asserted by an investor against commodities brokers).

Similarly, there is evidence in the record to support the jury's finding of negligence. Significantly, McPartland, the broker primarily responsible for Mr. Scott's account, testified that Invest did not conduct any investigation into Mr. Scott's "suitability" when his account was converted from a cash account to a margin account. Invest's failure to do so could have been considered by the jury in deciding whether the Dime (acting through its agents at Invest) acted reasonably and

---

10. During its deliberations, the jury wrote a note asking the following: "If we considered Invest chargeable, does this mean we also find Dime liable?" (Tr. 559). After discussing the note with the parties (Tr. 559–61, 564–66), I gave the jurors a supplemental instruction advising them that (i) the Dime and Invest were separate corporations, (ii) Invest was not before the jury, (iii) the jury was to consider whether the *Dime* was liable, and (iv) the jury was to consider whether certain individuals were agents of the Dime who acted within the scope of their authority. (Tr. 568). I also instructed the jury on the law of agency. (Tr. 568–69). Ultimately, the jury was charged: "If you find that the Scotts have proven an agency relationship, the Dime is responsible for the actions of its agents taken within the scope of the authority given to them by the Dime." (Tr. 569).

11. The jury was charged in this respect as follows:

A fiduciary has a duty to its principal to deal fairly with the principal in all transactions between them, to use reasonable efforts to provide the principal with the information relevant to the affairs with which the fiduciary has been entrusted, and to act only as authorized by the principal, except when privileged to protect its or another's interests. If you find the existence of a fiduciary relationship, you must determine whether the Dime breached any of these obligations or otherwise violated the trust and confidence placed in it by the Scotts.

Remember that the law does not require a fiduciary to be infallible. A fiduciary who makes a mere error of judgment when he or she is acting in an ordinarily prudent and reasonably diligent manner is not liable for breach of fiduciary duties.

(Tr. 544–45).

diligently. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697 F.Supp. at 1227 (violation by a broker of NASD "suitability rule," which requires evaluation of customer's financial situation and suitability to invest, was a factor that jury could weigh in considering negligence claim against the broker). *See also Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 465 F.Supp. 1233, 1236 (S.D.N.Y.1979) (brokers' violations of New York Stock Exchange rules can be remedied by state common law actions for breach of contract and negligence).

Likewise, Mr. Scott testified that when McPartland went away on vacation, Harrienger was unable to cover his account because he was "overloaded," and that when McPartland returned, he was unable to handle everything that Harrienger "dumped" on him. (Tr. 129, 131). The jury could have reasonably found, under the circumstances, that Invest (and hence the Dime) failed to act with due care in its handling of Mr. Scott's account.

In sum, on the record presented, I cannot say that there is but one conclusion that reasonable jurors could have reached as to the negligence claim. Accordingly, the jury's verdict as to the negligence claim must also be upheld.

■ Since the jury's comparative fault findings reduce the negligence award but not the breach of fiduciary duty award, *City of New York v. Corwen,* 164 A.D.2d 212, 565 N.Y.S.2d 457 (1st Dep't 1990) (comparative negligence defense allowed as to negligence but not intentional torts), I will enter judgment for plaintiff on the breach of fiduciary duty claim in the full amount awarded by the jury: $36,000.

### B. *The Motion for Summary Judgment*

■ Based on the evidence presented at trial and the post-trial submissions, the following facts are indisputable: the Scotts borrowed $100,000 from the Dime; they executed a mortgage on Mrs. Scott's house in favor of the Dime as security for the loan; the Scotts defaulted on the loan and have not made a payment of principal or interest since June 1988; the loan has been accelerated by

the Dime; and the Dime has paid substantial amounts for taxes and insurance on the property to protect its mortgage.

In *Graf v. Hope Bldg. Corp.,* 254 N.Y. 1, 171 N.E. 884 (1930), the Court of Appeals held that a mortgagor who defaults is bound by the terms of the contract—the mortgage—and cannot be relieved from the default in the absence of fraud, estoppel, bad faith, oppressive or unconscionable conduct, or waiver by the lender. *See also Shell Oil v. McGraw,* 48 A.D.2d 220, 368 N.Y.S.2d 610 (4th Dep't 1975); *but see Graf,* 254 N.Y. at 13, 171 N.E. 884 (Cardozo, Ch. J., dissenting). Although a foreclosure action is an equitable action, the "essence" of the *Graf* decision is that:

> the mortgage contract is to be strictly enforced according to its terms, at least insofar as default in paying principal and interest is concerned. To insist under such circumstances upon strict enforcement of the agreement—and thus the right to accelerate—was held in *Graf* not to be oppressive, unconscionable or inequitable.

1 *Bergmann on New York Mortgage Foreclosures* § 5.05[2], at 5–39 (1995).

Here, of course, the jury rejected plaintiffs' allegations of fraud. Hence, the only issue is whether the jury's findings in favor of plaintiffs' on their breach of fiduciary duty and negligence claims give rise to some equitable defense to foreclosure. I find that they do not.

First, I agree with the Dime that the jury's award of $36,000 in damages suggests that the jury did not base its findings of liability on the making of the loan. Although there was evidence that the Scotts were persuaded to borrow more than they needed, in fact they received $100,000. The negligence and/or breach of fiduciary duty occurred not with respect to the making of the loan, but with respect to the subsequent investment of $52,000 of the loan proceeds through Invest. *See Blueberry Investors Co. v. Ilana Realty, Inc.,* 184 A.D.2d 906, 585 N.Y.S.2d 564, 565–66 (3d Dep't 1992) (allegations that plaintiff mortgagee tortiously interfered with defendant borrower's efforts to sell mortgage property, even if true, did not establish defense of unclean hands to foreclosure action);

*Goldberg v. Goldberg,* 173 A.D.2d 679, 570 N.Y.S.2d 333, 334–35 (2d Dep't 1991) (to establish unclean hands, the conduct relied on must directly relate to the property in question).

Second, to the extent that the jury has found that the Dime has engaged in negligent conduct and/or breached its fiduciary duties, the jury has determined that the Scotts will be made whole by an award of $36,000. To permit the Scotts to escape their obligations under the note, when they admittedly received the money and have not made a mortgage payment since 1988, would be to give them a windfall.

Third, the Scotts are not wholly without fault. In fact, the jury found that the Scotts were more at fault than the Dime, finding that the Scotts were 54% at fault and that the Dime was only 46% at fault. Indeed, the evidence showed that Mr. Scott was very much involved in the process of choosing which stocks to buy and sell. Moreover, the evidence showed that Mr. Scott invested another $32,000 the loan proceeds in the stock market through another brokerage company, E.F. Hutton. (Tr. 190).

Finally, the Dime has agreed that it will establish a life tenancy for Mrs. Scott; hence, foreclosure will not result in her being evicted from her home.

Accordingly, the Dime will be granted a judgment of foreclosure, on the condition that Mrs. Scott be given a life tenancy and that any purchaser will take title subject to her life tenancy.

### Conclusion

The Dime's motion is denied to the extent it seeks judgment as a matter of law dismissing the breach of fiduciary duty and negligence claims and it is granted to the extent it seeks judgment on its counterclaim for foreclosure. The Dime is directed to submit a proposed judgment within 10 days after entry of this decision. The Scotts are to submit any objections to the language of the Dime's proposed judgment within five days after they receive the proposed judgment. The jury's award of $36,000, plus interest at 9% per annum from October 19, 1987, is to be set-off against the amounts owed by plaintiffs on the counterclaim.

SO ORDERED.