**MERRILL, LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff,**

v.

**Douglas T. MILLAR and Deborah L. Millar, Defendants.**

**No. Civ.A. 02–1408.**

United States District Court, W.D. Pennsylvania.

May 20, 2003.

Richard R. Nelson, II, Anthony Cillo, Cohen & Grigsby, Pittsburgh, PA, Todd D. Brody, Christopher P. Hall, Morgan, Lewis & Bockius, New York, NY, for Plaintiff.

Robert B. Sommer, James L. McKenna, Jr., Hergenroeder, Rega & Sommer, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION

CERCONE, District Judge.

### I. INTRODUCTION

Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") brings this action under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, to vacate the award of the JAMS Endispute arbitration panel in favor of Douglas T. Millar and Deborah L. Millar (the "Millars") in the amount of $7,741,305.00. Following eight (8) days of hearing before a panel composed of retired Judge Emery von Kann, retired Judge Stanley Harris, and Attorney Phillip E. Cottone (collectively the "Panel"), the Panel found, *inter alia,* that Merrill breached certain contractual duties and obligations owed to the Millars including the duty to act with "reasonable care and diligence in responding to [the Millars'] instructions" to sell a substantial portion of their stock holdings in FreeMarkets, Inc. Merrill Lynch now asks this Court to vacate the arbitration award contending that the arbitration panel exceeded its powers in that the terms of the award were "completely irrational," and the decision of the panel was in "manifest disregard for the law."

### II. STATEMENT OF THE CASE

#### 1. *Facts*

Over a period of time from the beginning of 1996 to 1999, the Millars invested approximately $190,000.00 in FreeMarkets, Inc., compiling approximately 200,000 shares. Tr. 110–112. In December of 1999, FreeMarkets went public and the value of the stock soared to $280.00 per share on the first day of trading. Tr. 114. The Millars were unable to take immediate advantage of their new found wealth, however, because their shares were subject to a lock-up agreement that prevented the Millars from selling their stock until June 7, 2000. Tr. 371–372.

The Millars began searching for the best financial institution to help them manage their wealth. Tr. 124–125. Because the majority of their net worth was tied up in a single holding, FreeMarkets, the Millars wanted to turn part of their stock holdings into cash, which when prudently invested, would permit Deborah Millar to resign her position as a radiologist and stay at home with the Millars' two (2) young children. Tr. 117–118. The Millars opened a new account with Merrill Lynch in the Sewickley Office and deposited their FreeMarkets stock into the account. Tr. 179–180, 963–966. The Millars were invited by Merrill Lynch to fly to Merrill Lynch's headquarters in New York City to meet with some of its highest ranking executives. Tr. 141. In February of 2000. Doug Millar went to New York City with three (3) Merrill Lynch brokers from the local Pittsburgh office, Scott Umstead, Todd Foster and Dave Foster. Tr. 138–141.

In New York, Doug Millar met several of Merrill Lynch's top people, and he was given a presentation about why the Merrill Lynch firm would be the best choice to advise and guide the Millars toward their objectives of monetization, risk management and charitable giving. Tr. 141–163. Doug Millar was impressed with Merrill Lynch's Private Advisory Services ("PAS") and Customized Investments, Investment Strategies and Product Group which as he understood it would give him access to world class advisors through his local financial advisor. Tr. 147–151. After Doug Millar returned to Pittsburgh, he and his wife decided to allow Merrill Lynch to manage their money. Tr. 165–168.

Nothing was done with the Millars stock from February of 2000 through June 7,

2000, the date the lock-up expired. Tr. 184–186. When the lock-up expired, the Millars directed Merrill Lynch to sell 5000 shares of their FreeMarkets stock at $57.00 per share. Tr. 196. The shares were sold, the Millars received a confirmation of the sale, and Doug Millar circled the $284,990.50 in proceeds that they realized from the sale of the stock. Tr. 306–309. Because the price of the FreeMarkets stock was not sufficient for their monetization plan, the Millars decided to wait until the price increased before they sold any more of the stock. Tr. 367–368.

On September 1, 2000, Doug Millar met with Dave Foster and Todd Foster at Merrill Lynch's office in the U.S.X. Building in Pittsburgh. Tr. 227. At the meeting, Dave Foster gave an extensive presentation regarding strategies once the monetization was in place. Essentially Dave Foster gave a presentation regarding Merrill Lynch's stable of money managers in a variety of disciplines that would in essence manage the Millars' money similar to a mutual fund concept. Tr. 227–228. Following a two (2) hour presentation, Dave Foster told Doug Millar that it was a good program, but he, Dave Foster, "could do better." Tr. 229, 684. Later that same day, Doug Millar and Todd Foster played golf together. Tr. 230. They discussed the monetization strategy that afternoon, and Todd Foster told Doug Millar that the price of FreeMarkets stock was reaching into the eighties. Tr. 232. Doug Millar and Todd Foster discussed the implications of selling 100,000 shares at $80.00 per share and its affect on the monetization strategy and the plan to replace Mrs. Millar's income. Tr. 233–234, 690–692. Doug Millar testified that he told Todd Foster that $80.00 per share would be sufficient and to sell those shares. Tr. 235. Moreover, Todd Foster testified that he recommended that Doug Millar sell 100,000 shares of the FreeMarkets stock because of the price on September, 1, 2000. Tr. 690. There was no ambiguity: Todd Foster admitted that Doug Millar expressed an intent to sell 100,000 shares when the market opened on Tuesday, September 5, 2000. Tr. 693, 694. Todd Foster then told Doug Millar that he would talk to Dave Foster on Tuesday and tell him of Doug Millar's wishes to sell. Tr. 237, 693–694.

Todd Foster testified that on Tuesday, September 5, 2000, he told Dave Foster that Doug Millar wanted to sell 100,000 shares of his FreeMarkets stock. Tr. 695. Todd further testified that Dave Foster said he would call Doug Millar because the shares were tied up in a call strategy. Tr. 696. Dave Foster contends that he spoke with Doug Millar on September 6, 2001, and Doug made no mention of an order to sell 100,000 shares of stock. Tr. 1230–1231. On September 27, 2000, Todd Foster and Dave Foster met Doug Millar at Millar's travel business to discuss a 401K plan for the business. Tr. 1232. Dave Foster testified that he also had a discussion with Doug Millar at that time about his option positions and, again, no mention was made about the alleged order to sell the FreeMarkets stock. Tr. 1235

Despite not receiving a confirmation on the sale of 100,000 shares of his FreeMarkets stock, Doug Millar alleged that he did not know the stock was not sold until October 25, 2000, when Dave Foster called him to talk about certain option contracts. Tr. 245–247. In fact, Doug Millar testified that be reviewed his September 2000 statement from Merrill Lynch and that there was no indication that a large block of FreeMarkets stock was sold. Tr. 405–406. Though he was upset, Doug Millar contended that Dave Foster assured him his strategy was sound, restored his confidence in the strategy, and Doug Millar again deferred to Dave Foster's expertise. Tr. 248–249. After similar endorsements

from Todd Foster and Scott Umstead,[1] the Millars decided to stay with the team of Dave Foster, Todd Foster and Merrill Lynch. Tr. 253–254.

By late December, the price of FreeMarkets had fallen below $20,00 per share. Doug Millar contends he met with Todd Foster and Dave Foster on December 22, 2000 because he was concerned about what Merrill Lynch had promised and what he was actually getting. Tr. 268–269. Incredibly, Doug Millar testified that even at this point in the relationship, he did not realize that he and his wife were not at risk in the market. Tr. 269–270.

In March of 2001, Doug Millar sent an e-mail to Tim Miller, a manager at Merrill Lynch, expressing his concern over the performance of his account and Merrill Lynch's responsibility for such performance. *See* Merrill Lynch Appendix Vol. 1, Tab 14. Doug Millar's complaints, however, did not include a complaint that Merrill Lynch failed to exercise an order to sell 100,000 shares of his FreeMarkets stock. *Id.* When the Millars moved their accounts from Merrill Lynch in April of 2001, the price of FreeMarkets had fallen below $15.00 per share.

### 2. *Findings of the Arbitration Panel*

Following eight (8) days of hearings in Pittsburgh, Pennsylvania from May 6, 2002, through May 9, 2002, and from May 13, 2002, through May 16, 2002, final oral argument on June 11, 2002, and submission of post-hearing briefs by the parties, the majority[2] of arbitrators concluded as follows:

1. The Respondent's Motion for Partial Summary Judgment is denied.

2. Merrill Lynch breached certain contractual obligations and duties it

owed Claimants under the circumstances of this particular broker-customer relationship, including the duty of the New York Private Advisory Services group to work with Claimants' Pittsburgh Financial Consultants to formulate and implement strategies with the most suitable recommendations for Claimants' individual needs and objectives, the duty to develop and adequately explain to Claimants the advantages and disadvantages of various need-based solutions for their highly concentrated position, and the duty to act with reasonable care and diligence in responding to Claimants' instructions. These instructions included what was acknowledged by the agent of Merrill Lynch with responsibility for the relationship with Claimants to be, at the very least, a clear and unambiguous indication of the Claimants' desire to sell a significant part, 100,000 shares, of their FreeMarkects holdings on September 5, 2000. Moreover, from August 29, 2000 through September 5, 2000, FreeMarkets stock had finally reached a level at which sale of 100,-000 shares would achieve Claimants' clearly stated objectives. Accordingly, Respondent is liable for not effecting the requested, and plainly called for, sale of 100,000 shares on September 5, 2000. These breaches damaged Claimants by depriving them of the extent of the monetization of their FreeMarkets stock which would have occurred if Merrill Lynch had properly discharged its duties. Claimants were not contrib-

---

1. In the fall of 2000, Scott Umstead was no longer employed by Merrill Lynch. Tr. 253.

2. Arbitrator Stanley S. Harris dissented from the majority's finding of liability on the part of Merrill Lynch.

utorily negligent in causing such damages.

3. Within a reasonable time after September 5, 2000. Claimants knew or should have known that no stock was sold that day and had a duty to take reasonable steps to mitigate their damages. However, given Dave Foster's urging to "stay the course." Soon Umstead's assurance that Dave was the best Merrill had, the evaluation of Claimants' long-time financial advisor Todd Foster that they were in good shape and should indeed stay the course, and the continuing recommendations of the Merrill Lynch Research Department to buy and accurnulate FreeMarkets, Inc. stock, the duty to mitigate did not mandate that Claimant's sell immediately. The majority finds that following the meeting of December 22, 2000, which left Mr. Millar with the feeling that Merrill Lynch representatives were not being honest in assuring him that they could achieve all of his objectives if given sufficient time, such a duty clearly arose, and Claimants are charged with a sale in mitigation at the average price the first business day following that meeting. Therefore, the fair measure of Claimants' damages resulting from Respondent's failure to effect the September 5, 2000, sale is the difference between the net proceeds of a sale of 100,000 shares of FreeMarkets, Inc. stock at the average price on that day and the sale in mitigation on December 26, 2000, which is charged to the Claimants.

4. Claimants are also entitled to be compensated for being deprived of the use of this money from September 5, 2000 to date. A fair and reasonable way to do so, based on the testimony, is to award Claimants interest at the ten year tax free municipal bond rate on September 5, 2000, increased to account for the fact that Claimants will be required to pay taxes on this award at ordinary income rates. Applying such interest rate (7.69%) initially to the entire September 5, 2000, sale balance and then to the reduced balance after charging the sale in mitigation on December 26, 2000, brings Claimants' total damages to $7,741,305 through June 30, 2002.

5. The Claimants have also asserted that Merrill Lynch also failed in its duty to identify and explain to Claimants possible strategies to implement during the lockup period; the majority finds that Respondent did fail in this duty but that Claimants have not proven that any strategies were either practical or would have been adopted by them. Additionally, Claimants contend, and the majority finds, that the covered call strategy recommended and carried out by Respondent postponed monetization and was inconsistent with Claimants' objectives; however, Claimants have not proven that such failures have caused them damages which exceed the amount awarded above plus the premium income derived from the covered calls. Thus no additional damages are awarded for these further breaches.

6. Claimants have not established their claims for placing unsuitable investments in Mrs. Millar's retirement account, or for punitive damages, or for attorneys fees and arbitration costs. Thus, Claimants are awarded nothing on these claims.

## III. STANDARD OF REVIEW

A court will set aside an arbitral verdict only in "very unusual circumstances."

*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). There is a "strong presumption" in favor of an arbitration award. *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.,* 868 F.2d 52, 56 (3d Cir.1989). The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* provides that an arbitration award may be vacated:

   (1) Where the award was procured by corruption, fraud or undue means.

   (2) Where there was evident partiality or corruption in the arbitrators....

   (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

   (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). The grounds upon which this Court may vacate an arbitration award are "narrow in the extreme." *Amalgamated Meat Cutters & Butcher Workmen of N. Am., Local 195 v. Cross Brothers Meat Packers, Inc.,* 518 F.2d 1113, 1121 (3d Cir.1975). It is not the proper role of the court to "sit as the [arbitration] panel did and reexamine the evidence under the guise of determining whether the arbitrators exceeded their powers." *Mutual Fire,* 868 F.2d at 56. Even under these restrictive criteria, our review of arbitral decisions is quite circumscribed.[3] Stated most broadly, we are not here to review the merits of the arbitrators' decision. *See United Paperworkers*

*Int'l Union v. Misco. Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). We do not review for error either the arbitrators' interpretations of law, or their interpretation of contractual provisions. *See Wilko v. Swan,* 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953). *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 203 n. 4, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

In addition to the statutory grounds, a district court may also vacate an award if the arbitrators displayed a "manifest disregard" of the law, *First Options,* 514 U.S. at 942, 115 S.Ct. 1920, or if the award was "completely irrational." *Mutual Fire,* 868 F.2d at 56. "Manifest disregard of the law" by arbitrators is a judicially created ground for vacating their arbitration award. *See Wilko v. Swan,* 346 U.S. at 436–37, 74 S.Ct. 182. To the extent that we review for "manifest disregard" of the law, this "clearly means more than error or misunderstanding with respect to the law." *See, ConnTech Dev. Co. v. University of Conn.,* 102 F.3d 677, 687 (2d Cir.1996)(quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986)). Specifically, a court should not vacate an award unless it finds "both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998), *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997). *cert. denied,* 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998). These principals reinforce the proposition that in deciding to vacate an arbitration award, it is not enough to find that the arbitrators erred, but a reviewing

---

3. The limits placed on our review powers are in line with the general federal policy in favor of arbitration. *See Southland Corp. v. Keat-*

*ing,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

court must find that their decision escaped the bounds of rationality.[4]

## IV. DISCUSSION

Merrill Lynch argues that the Panel manifestly disregarded the law: (a) by failing to apply the doctrine of ratification and by ignoring the Millars' obligation to contest discrepancies in their account within ten (10) days; (b) on the Millars' duty to mitigate damages; and (c) when it found that Merrill Lynch was liable for its failure to execute an order to sell 100,000 shares of stock on September 5, 2000. The Court will first address Merrill Lynch's third argument.

### A. *Failure to Execute Order to Sell 100,000 Shares of FreeMarkets Stock*

■ The Panel specifically found that Merrill Lynch breached "the duty to act with reasonable care and diligence in responding to Claimants' instructions ... [which] instructions included what was acknowledged by the agent of Merrill Lynch with responsibility for the relationship with Claimants to be, at the very least, a clear and unambiguous indication of the Claimants' desire to sell a significant part, 100,000 shares, of their FreeMarkets holdings on September 5, 2000." Final Award ¶ 2. Accordingly, Merrill Lynch was found liable for its failure to effect "the requested, and plainly called for sale of 100,000 shares on September 5, 2000." *Id.*

Merrill Lynch argues that it had no duty to monitor a customer's non-discretionary account and to "prod a customer into taking action consistent with previously expressed objectives." Merrill Lynch Brief at 23. Further, Merrill Lynch relies upon *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir.2002) for its conten-

tion that it only owed the Millars a duty once an order was placed. Specifically, Merrill Lynch points to the following language from the Second Circuit:

> It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions. On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale. The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention....As the district court observed, these cases generally are cast in terms of a fiduciary duty, and reflect that a broker owes no such duty to give ongoing advice to the holder of a nondiscretionary account.

*Id.* at 1302. (Citations omitted)(Emphasis added). Such contentions by Merrill Lynch ignore the realities of its relationship with the Millars.

Merrill Lynch invited the Millars to its headquarters in New York City to meet with some of its highest ranking executives. At that time, Merrill Lynch was aware that the Millars were meeting with other firms in order to find advisors to help them manage their wealth and achieve their investment objectives. Mer-

---

4. Merrill Lynch also argues that theses same three grounds also provide a basis for this Court to vacate the arbitration award on the grounds that the award is completely irrational.

rill Lynch was also acutely aware that the Millars had a net worth at that time in excess of $10 million. Moreover, the program that Merrill Lynch presented Doug Millar was its Private Advisory Services. The PAS offered the Millars world class advisors that would work with and through the Millars local advisors. This is what Merrill Lynch was selling. Merrill Lynch did not at any time assert to the Millars that it would not monitor their account or that it would not give them advice on an ongoing basis. To the contrary, Merrill Lynch told the Millars it would work with them to formulate strategies with the most suitable recommendations for their investment needs. Appendix to Millars' Brief at Tab 1.

There is no evidence that would suggest that the aggressive option strategy employed by Merrill Lynch was developed by Doug Millar. This was Dave Foster's strategy. Further, there is no evidence that Doug Millar would call Dave Foster on a systematic basis and instruct him to buy or sell puts and calls. To the contrary, Dave Foster was the prime mover behind the options strategy. Yet, after selling the Millars on its experience and ability to advise, manage and achieve their financial objectives, Merrill Lynch contends its only duty was to act with diligence and competence in the execution of an order. The Court finds such contention untenable. The Millars were not invited to Merrill Lynch headquarters in New York City merely to find technicians capable of executing a brokerage order.

Regardless of Merrill Lynch's argument that the duty owed to the Millars was surprisingly narrow, the Panel found an unambiguous indication of the Millars' intent to sell 100,000 shares of FreeMarkets stock on September 5, 2000. Moreover, whether a fiduciary duty exists cannot be determined "by recourse to rigid formulas." *Scott v. Dime Sav. Bank of New York,* 886 F.Supp. 1073, 1078–79 (S.D.N.Y.1995)("Under New York law, stockbrokers may owe fiduciary duties to their customers.") Rather, it depends upon "whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Id.* More simply, "the existence of fiduciary duties depends on the facts of a particular relationship." *Vannest v. Sage, Rutty & Co.,* 960 F.Supp. 651, 655 (W.D.N.Y.1997)(quoting *Boley v. Pineloch Assoc., Ltd.,* 700 F.Supp. 673, 680 (S.D.N.Y.1988)). The Panel obviously determined that the relationship between the Millars and Merrill Lynch exceeded that found ordinarily between a broker and a nondiscretionary account holder.

Where the account is a nondiscretionary account such as the account maintained by the Millars, the duties of the broker include:

(1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to retrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer. (Citations omitted).

*Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa.Super. 165, 514 A.2d 552, 561 (1986) *quoting Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich.1978). These duties as

outlined in *Perelle*, however, are not all encompassing.

Based upon the testimony of both Doug Millar and Todd Foster, an employee of Merrill Lynch, there is adequate evidence in the record to justify the Panel's decision that Merrill Lynch breached its duty to "carry out the customer's orders promptly in a manner best suited to serve the customer's interests." Merrill Lynch failed to sell the 100,000 shares of FreeMarkets stock on September 5, 2000, despite the "a clear and unambiguous" instructions of Doug Millar, as conveyed to Dave Foster through Todd Foster.

Aside from an obvious failure to execute its client's order, Merrill Lynch clearly failed to deliver the services it promised to the Millars. Instead of using its "world class advisors" to implement a reasonable and prudent plan of monetization and conservative diversification that would have allowed the Millars to preserve a portion of their $10 million nest egg, Dave Foster placed their money into the high risk arena of options trading. This strategy was unsuitable to meet the clear objectives of the Millars, and the Panel did not disregard the law, and was certainly not irrational, in so finding.

### B. *Duty to Mitigate Damages*

■ Merrill Lynch argues that the arbitration award must be vacated because the Panel failed to apply the doctrine of mitigation of damages. In Paragraph 3 of its award, the Panel found that "[w]ithin a reasonable time after September 5, 2000, Claimants knew or should have known that no stock was sold that day and had a duty to take reasonable steps to mitigate their damages." Obviously then, the Panel did make application of the doctrine to the facts as presented to them. Merrill Lynch, contends, however, that the Panel "proceeded to disregard the law by permitting the Millar's to wait more than three months before being required to effect a sale to mitigate their damages." *See* Merrill Lynch Brief at 18.

To establish a mitigation defense, Merrill Lynch had the burden of showing: (1) what reasonable actions the Millars should have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced. *Koppers Co. v. Aetna Casualty & Surety Co.*, 98 F.3d 1440, 1448 (3d Cir.1996). The test is whether the Millars' actions, in the face of Merrill Lynch's clear failure to effect the sale of the FreeMarkets stock, were reasonable considering all the facts and circumstances. *Aircraft Guaranty Corp. v. Strato-Lift, Inc.*, 991 F.Supp. 735, 739 (E.D.Pa. 1998); *see also S.J. Groves & Sons Co. v. Warner Company*, 576 F.2d 524, 528 (3d Cir.1978)(stating that "the requirement of ... mitigation is not an absolute, unyielding one, but is subject to the circumstances"). Moreover, an injured party is not obligated to mitigate damages when both parties have an equal opportunity to do so. *Loyal Christian Benefit Ass'n v. Bender*, 342 Pa.Super. 614, 493 A.2d 760, 763 (1985); *see also S.J. Groves & Sons Co. v. Warner Company*, 576 F.2d 524, 530 (3d Cir.1978).

Once it is determined that the Millars had a duty to mitigate damages, it must be ascertained whether the action taken in response to Merrill Lynch's conduct was reasonable. *See Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.*, 743 F.Supp. 212, 219 (S.D.N.Y.1990)(citing *Toyota Industrial Trucks v. Citizens National Bank*, 611 F.2d 465, 471 (3d Cir.1979)). The Panel obviously considered the particular facts and circumstances surrounding the dealings between Merrill Lynch's advisors and the Millars, and allowed a reasonable degree of delay stating as follows:

... given Dave Foster's urging to "stay the course," Scott Umstead's assurance that Dave was the best Merrill had, the evaluation of Claimants' longtime financial advisor Todd Foster that they were in good shape and should indeed stay the course, and the continuing recommendations of the Merrill Lynch Research Department to buy and accumulate FreeMarkets, Inc. stock, the duty to mitigate did not mandate that Claimant's sell immediately. The majority finds that following the meeting of December 22, 2000, which left Mr. Millar with the feeling that Merrill Lynch representatives were not being honest in assuring him that they could achieve all of his objectives if given sufficient time, such a duty clearly arose, and Claimants are charged with a sale in mitigation at the average price the first business day following that meeting.

*See* Final Award ¶ 3.

Obviously the Panel gave the doctrine of mitigation considerable thought and application. Whether this Court agrees with such application, or whether this Court would have come to a different result, is irrelevant. The Court is unable to find a manifest disregard of the doctrine of mitigation, nor can it find the Panel's findings to be irrational to any degree. The award shall not be vacated as requested by Merrill Lynch based upon the Panel's application of the doctrine of mitigation.

### C. *Doctrine of Ratification*

■ Lastly, Merrill Lynch argues that the award must be vacated because the Panel manifestly disregarded the law of ratification. In the broker/customer context, the doctrine of ratification prohibits the customer from disavowing unauthorized actions in his or her account when it is clear from all circumstances that the intent of the customer was to adopt as his own and for all times the acts made without authorization. *See Richardson Greenshields Sec., Inc. v. Lau,* 819 F.Supp. 1246, 1259 (S.D.N.Y.1993). Merrill Lynch argues that the Millars knew or should have known of the alleged failure to sell the FreeMarkets stock because they did not receive a confirmation verifying the transaction, and because the Millars routinely received monthly statements[5] from Merrill Lynch which summarized the trading activity in their account. The Millars' failure over the prolonged period to complain to Merrill Lynch, therefore, constituted a ratification of Dave Foster's conduct. It is clear also that the burden of proving ratification is on Merrill Lynch. *Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748, 752 (S.D.N.Y.1968), *rev'd on other grounds* 407 F.2d 521 (2d Cir.1969).

The Millars argue that the Panel was never presented with the ratification argument by Merrill Lynch, and therefore, the Panel could not disregard an argument that was not presented. We disagree. In its Answer, Merrill Lynch set forth as an affirmative defense the following:

> The damages claimed by Claimant are barred or limited to the extent that the alleged damages were caused in whole or in part by Claimants' own conduct or by Claimants' failure to take timely action when timely action on their part was necessary.

*See* Merrill Lynch Appendix to Brief at Tab 2, p. 13. In addition, in its Post-Hearing Brief, Merrill Lynch argued that the Millars were estopped from recovery because of their failure to timely object to Merrill Lynch's alleged failure to execute the sell order. By footnote, Merrill Lynch

---

5. The account statements state that "[t]his statement shall be deemed conclusive if not objected to within ten (10) days of receipt."

also expressly set forth its ratification argument. *See* Exhibit C to Merrill Lynch Complaint to Vacate Arbitration Award, p. 27.

It is clear from the evidence that the Millars knew by October, 2000, that their FreeMarkets stock had not been sold on September 5, 2000, and that their account had not been credited with the $8 million of proceeds that would have resulted from the sale. They did not raise the issue with anyone at Merrill Lynch. Doug Millar was meticulous in reviewing his statements, yet he did not raise an eyebrow when the sale, that he contends he authorized and would have resulted in an $8 million nest egg for his family, was glaringly absent from his September 2000 account statement. It can certainly be argued that the Millars were playing the exact same game that the doctrine of ratification was meant to prevent; that being "playing the market" at the expense of the broker. Clearly the doctrine does not allow one to "stand by and appropriate the benefit of the broker's conduct if profitable, or renounce it if otherwise, at his election; he cannot speculate at the broker's expense; and this is especially true if the instructions of the customer are more or less ambiguous, and the broker's unauthorized acts or omissions are not the result of fraud or wilful defiance." *Montgomery v. Van Ronk*, 328 Pa. 508, 195 A. 910, 911–912 (1938).

The Millars had made a decision to sell their stock at or around the $80.00 per share mark, however, it is not inconceivable that they longed for the stock to return to its previously staggering heights in excess of $300.00 per share. It was clear they were holding a very volatile stock in a market that was experiencing "tech sector" implosion. The Millars chose to take a chance, albeit based upon the advice of Merrill Lynch, but the stock price continued to fall. There is a good chance that another panel, or a district court, may have come to a far different result based upon the doctrines of estoppel, ratification and contributory negligence.

That said, however, it is clear from the Panel's Final Award that they contemplated Merrill Lynch's testimony, arguments, and case law in this regard and found them wanting. The Panel expressly found that "Claimants were not contributorily negligent in causing such damages." *See* Final Award ¶ 2. Manifest disregard requires more than a finding of an error or misunderstanding of the applicable law. This Court cannot, and will not, vacate an award unless it finds "both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." (Citations omitted). This Court is unable to point to any objective evidence that the Panel knew the law, but chose to ignore it. To the contrary, the Panel heard eight (8) days of testimony, was in the best position to judge credibility, and had the benefit of post-hearing arguments of counsel and post-hearing briefs. To substitute a district court's independent adjudication for that of a panel of arbitrators without an express finding of manifest disregard of the law, is a clear contravention of the federal policy in favor of arbitration. *See O.R. Securities, Inc. v. Professional Planning Assoc., Inc.* 857 F.2d 742, 747 (11th Cir.1988), *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

Moreover, whether the Millars ratified Merrill Lynch's failure to execute the order to sell 100,000 shares of FreeMarkets stock is of no moment. The Panel found that Merrill Lynch breached a duty owed to the Millars "to formulate and implement strategies with the most suitable recommendations for Claimants' individual needs

and objectives, the duty to develop and adequately explain to Claimants the advantages and disadvantages of various need-based solutions of their highly concentrated position ..." Final Award ¶ 2. The strategy implemented by Dave Foster and Merrill Lynch was inappropriate and not designed to achieve the Millars' objectives. The Millars were constantly assured by Merrill Lynch that monetization was a priority and that the covered call strategy would eventually achieve the objective if given time. The Panel obviously found that Merrill Lynch chose to delay the monetization and pursue an aggressive and imprudent option strategy. The finding of the Panel was that Merrill Lynch mismanaged the Millars' portfolio by failing to find investments suitable to meet their clear objectives.

## V. CONCLUSION

Based upon the foregoing, this Court finds that the Final Award of the panel of Arbitrators in the instant action constituted neither a manifest disregard of the law nor a decision outside the bounds of rationality. Merrill Lynch's Motion to Vacate Arbitration Award shall be denied. As appropriate order will follow.

### ORDER OF COURT

AND NOW this 20th day of May, 2003, upon consideration of Merrill Lynch's Motion to Vacate Arbitration Award, and the Millars' response thereto, the briefs of the parties and the arguments of counsel before this Court,

IT IS HEREBY ORDERED that Merrill Lynch's Motion to Vacate Arbitration Award **(Document No. 1)** is **DENIED.** The Arbitration Award entered pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* in favor of Douglas T. Millar and Deborah L. Millar and against Merrill Lynch, Pierce, Fenner & Smith, Inc. in the amount of $7,741,305.00 is

**CONFIRMED.** The Clerk is hereby directed to mark this case closed.